

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

REX A. SINQUEFIELD and
TRAVIS BROWN,

        Respondents,

vs.

TODD S. JONES and MISSOURI
ROUNDTABLE FOR LIFE,

        Appellants.

WD77056

Opinion filed: March 11, 2014

**APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY, MISSOURI**
**THE HONORABLE JON E. BEETEM, JUDGE**

Before Special Division: James E. Welsh, Chief Judge,
Victor C. Howard, Judge and Thomas H. Newton, Judge

This case involves a challenge to the fiscal note and fiscal note summary of a ballot title for an initiative petition submitted by Todd Jones. The initiative seeks to impose campaign contribution limits and make other campaign finance related changes to the Missouri Constitution. Todd Jones appeals the judgment of the Cole County Circuit Court ("trial court") declaring the fiscal note and the fiscal note summary insufficient and unfair. The trial court remanded the fiscal note and fiscal note summary to the state auditor for preparation of a new fiscal note and a new fiscal note summary.

In his two points on appeal, Mr. Jones challenges the trial court's judgment declaring the fiscal note and fiscal note summary insufficient and unfair. Mr. Jones asks this court to find that

the language of the fiscal note and the fiscal note summary was fair and sufficient and to reverse and remand the judgment with instructions to certify the fiscal note and fiscal note summary to the secretary of state pursuant to section 116.190.4. The judgment is reversed.

***Procedure for Initiative Petitions, Fiscal Note, and Fiscal Note Summary, and Challenges Thereto***

The procedure for initiative petitions consists of constitutional requirements as follows:

> [T]he initiative petition must (1) be signed by 8% of the voters in each of two-thirds of the congressional districts in the state, (2) be filed with the Secretary of State no less than four months before an election, (3) contain a proper enacting clause, and (4) contain no more than one amended and revised constitutional article, or one new article which contains not more than one subject and matters properly connected therewith.

*Brown v. Carnahan*, 370 S.W.3d 637, 645 (Mo. banc 2012) (quoting *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990) (citing Mo. Const., art. III, sec. 50)).

In addition, the requirements of chapter 116, RSMo Cum. Supp. 2012,[1] must be met in order for an initiative petition to appear on the ballot. *Id.* Chapter 116 provides that the petition must be approved by the attorney general and the secretary of state as to form. § 116.332.1. The secretary of state also sends a copy to the state auditor, who is to assess the fiscal impact of the proposed measure and prepare a fiscal note and fiscal note summary. *Id.* The secretary of state later certifies the official ballot title, which includes the secretary of state's summary statement and the auditor's fiscal note summary. *Brown*, 370 S.W.3d at 646. The ballot title is affixed to each page of the petition as it is circulated for the collection of the signatures necessary to have it placed on the ballot. *Id.*

---

[1] All statutory references herein are to RSMo Cum. Supp. 2012, unless otherwise noted.

At issue in this case are the fiscal note and fiscal note summary for an initiative petition that would limit campaign contributions ("Initiative"). The note and summary are prepared by the state auditor, who first "sends copies of the proposed ballot initiative to various state and local governmental entities requesting the entities review the same and provide information regarding the estimated costs or savings, if any, for the proposed ballot initiative." *Id.* at 649. The auditor's choice of local governmental entities is based on geography, population, and form of government, with a goal of reaching a good cross-section of local governments that might be affected by the proposal. *Id.* Proponents, opponents, and members of the public may submit fiscal impact information also, but the auditor has no duty to notify members of the public when he receives an initiative petition from the secretary of state. *Id.*

The auditor then examines the submissions received and determines whether they "appear complete, are relevant, have an identifiable source, and are reasonable." *Id.* "[T]he auditor examines the submission to establish whether it addresses or diverges from the particular issue" in order to determine whether the submission is reasonable. The auditor's analysis in this regard is based on his "experience in state government and overall knowledge and understanding of business and economic issues." *Id.* If a submission is unreasonable, the auditor "determines what weight the submission will be given when preparing the fiscal note summary." *Id.* If a particular submission leaves any questions or appears incomplete, the auditor may conduct a follow-up inquiry. *Id*. The auditor drafts the fiscal note and fiscal note summary based on the various submissions received. *Id.* The fiscal note consists of the responses submitted, listed verbatim with only minor editing. *Id.* In the fiscal note summary the auditor compiles the various proposals with the purpose of advising the voters about the potential cost or savings, if any, of adopting the initiative. *Id.* at 649-50.

3

Section 116.190 provides a means for citizens to challenge, in circuit court, the language of an official ballot title or fiscal note. *Overfelt v. McCaskill*, 81 S.W.3d 732, 736 (Mo. App. W.D. 2002) (quoting *Bergman v. Mills*, 988 S.W.2d 84, 90 n.4 (Mo. App. W.D. 1999)). The party challenging the official ballot title has the burden of showing why the fiscal note or fiscal note summary is insufficient or unfair. § 116.190.3; *Cures Without Cloning v. Pund*, 259 S.W.3d 76, 81 (Mo. App. W.D. 2008). If this requirement is met, the plaintiff is entitled to a "different fiscal note or fiscal note summary." § 116.190.3.

### *Factual Background and Procedural History*

On May 3, 2013, Todd Jones submitted to the Secretary of State a sample sheet for a proposed initiative petition regarding campaign contribution limitations. The Secretary of State then prepared a summary statement of the initiative and the State Auditor prepared a fiscal note and drafted a fiscal note summary, which were also approved by the Attorney General as to content and form. Subsequently the Secretary of State certified the official ballot title, which consisted of the summary statement and fiscal note summary.

On December 30, 2011, Rex Sinquefield filed a petition under section 116.190 challenging the official ballot title. He asserted, among other things, that the fiscal note and the fiscal note summary were insufficient and unfair. Mr. Sinquefield asked the court to find the fiscal note and the fiscal note summary insufficient and/or unfair and order the ballot title to be stricken and the fiscal note and fiscal note summary be remanded to the auditor for preparation of a new fiscal note and fiscal note summary.

On August 16, 2013, Todd Jones and Missouri Roundtable For Life ("Roundtable") moved to intervene in the case to defend the ballot title. The motion was granted and Mr. Jones and Roundtable filed an answer. On October 15, 2013 Mr. Sinquefield filed a motion for partial

4

summary judgment and suggestions in support thereof with respect to the summary statement. The Secretary of State filed a response and memorandum in opposition on October 22, 2013. The Secretary of State, Mr. Sinquefield, and Mr. Jones and Roundtable filed pre-trial briefs on October 18, 2013. On October 21, 2013, a joint stipulation of facts and exhibits was filed. On October 23, 2013 the court heard evidence, including the testimony of Jon Halwes as representative of the auditor, and arguments by the parties on all pending claims, and took the case under advisement. On November 26, 2013, the court entered judgment ruling, among other things, that the fiscal note and fiscal note summary are insufficient and unfair, and remanding the fiscal note and fiscal note summary for preparation of a new fiscal note and fiscal note summary.

The new fiscal note was not to include the Department of Revenue's submission to the auditor because the court concluded the submission to be unreasonable. The portion of the fiscal note summary reading, "Any potential impact to revenues for state and local governmental entities is unknown[,]" was to be changed to (1) forecast that the Initiative would have a negative impact on state and local revenues and (2) include the specific projections of diminished state and local revenues contained in a submission to the auditor from a self-identified opponent of the Initiative. This appeal by Mr. Jones followed.

First, Mr. Jones contends that the court erred in remanding the fiscal note because it was not insufficient and unfair in that the Department of Revenue's submission was reasonable and properly declined to forecast the Initiative's impact on state and local revenues. In his second point, Mr. Jones argues that the court erred in remanding the fiscal note summary because it was not insufficient and unfair in that the auditor "properly exercised [his] discretion in discounting the speculative analysis of" the Ellinger Submission and "properly summarized the Fiscal Note by stating that the proposal's impact on state and local tax revenues was 'unknown.'"

5

## *Standard of Review*

In the appeal of a court-tried civil case, the appellate court will affirm the judgment of the trial court "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Missouri Mun. League v. Carnahan*, 364 S.W.3d 548, 551 (Mo. App. W.D. 2011) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)).

## *Analysis*

## I. The Department of Revenue's Submission Was Not Unreasonable

Section 116.175 allows the state auditor to "consult with the state departments, local government entities, the general assembly and others with knowledge pertinent to the cost of the proposal[,]" and also allows "[p]roponents or opponents of any proposed measure [to] submit to the state auditor a proposed statement of fiscal impact estimating the cost of the proposal." The auditor reviews the submissions for completeness, relevance, source identity, and reasonableness. *Brown v. Carnahan*, 370 S.W.3d at 649. A submission is reasonable if it addresses the particular issue rather than diverges from it, which the auditor determines based upon his experience in state government and overall knowledge and understanding of business and economic issues. *Id.* For purposes of clarification, if needed, the auditor may conduct a follow-up inquiry with an entity whose submission raises additional questions or appears incomplete. *Id.*

In this case, submissions were made by a number of entities, among which were Marc Ellinger, an attorney and self-identified opponent of the Initiative ("Ellinger Submission"), and the Department of Revenue.

6

The Ellinger Submission consisted of estimates of fiscal impact to state and local entities, indicating a negative impact to the state based on lost state income tax, corporate income tax, and state sales tax. It argued that campaign finance reform would result in a decrease in campaign spending in Missouri, which would putatively cause a decrease in state and local tax revenues from campaign spending. The Submission contended that capping campaign contributions would result in less campaign spending, and less campaign spending would result in the collection of less sales and income taxes by state and local governments. The Ellinger Submission purported to extrapolate from figures from Governor Nixon's 2012 campaign to all other statewide campaigns for all future years. It claimed to predict with precision the actual fiscal impact on state and local tax revenues that would result from such anticipated decreases in campaign spending. The Ellinger Submission conceded that "there has not been a comprehensive study regarding the fiscal impact of state elections on Missouri state and local governments," and contained no such economic study.

Prior to receiving any response from the Department of Revenue, on May 17, 2013, Mr. Halwes, representative of the state auditor in this matter, emailed his contact at the Department, requesting that the Department "review the comments in the [Ellinger Submission] and comment on this potential impact" when responding to the fiscal impact request. The afternoon of May 22, 2013, a second, different employee of the Department emailed the auditor's office stating: "This initiative will have no impact on the Department.… Please contact me if you have additional questions." The following day, Mr. Halwes replied to the Department's email, requesting, "[b]esides the response provided today [*sic*] please also comment on the revenue impact to the state suggested in the [Ellinger Submission]. We need a response today – the fiscal is due soon." An hour later, he emailed again, "We need a response this morning." After

7

approximately twenty-five minutes, at 10:05 am, the second Department employee replied, "While we have no expertise in the area of the impacts of campaign spending, after reviewing the proposed statement of fiscal impact, this does not change our response to the fiscal note. This will not impact the Department of Revenue."

What followed was a rapid exchange of emails between Mr. Halwes and the Department employee meant to clarify the Department's perspective on the fiscal impact and the Ellinger Submission, but which ultimately confused the issue even further:

| | |
|---|---|
| Mr. Halwes (10:05 am): | You do not think the proposal will impact revenue to the state? |
| Department employee (10:08 am): | We would have no way of measuring the economic impact it may generate. |
| Mr. Halwes (10:08 am): | The [Ellinger Submission] is projecting a decrease in state revenue not an increase. |
| Department employee (10:15 am): | I'm sorry. I meant that any campaign spending would generate. |

Mr. Halwes testified that in the past, the Department of Revenue had responded to initiative petitions that dealt with tax- or revenue-related matters by "providing what their additional costs would be and… also… indicating what a fiscal impact would be on the State[.]" He testified that because the Department was in a position to provide more information, he thought it was prudent to follow up in this case by requesting that the Department comment on the revenue impact to the state. Mr. Halwes testified that he thought the Department's email response in this instance, however, indicated that "they were… specifically talking about the department itself versus the state overall." Mr. Halwes also believed the Department employee was confused when she responded, "[w]e would have no way of measuring the economic impact it may generate[,]" because Mr. Halwes felt this response indicated that "she was thinking it was going to generate revenue rather than reduce revenue."

8

The trial court made the following findings of fact regarding the Department of Revenue's submission to the auditor:

> 5.     The Department of Revenue initially submitted the following response:
>
> > The initiative petition will have no impact on the Department…
>
> 5. [*sic*] The Department of Revenue was then contacted by the State Auditor's Office and the following exchange occurred:
>
> > State Auditor's Office (SAO): [P]lease also comment on the revenue impact to the state in the attached proposed statement of fiscal impact…
> >
> > Department of Revenue (DOR): While we have no expertise in the area of the impacts of campaign spending… This will not impact the Department of Revenue
> >
> > SAO: You do not think the proposal will impact revenue to the state?
> >
> > DOR: We would have no way of measuring the economic impact it may generate
> >
> > SAO: The submission is projecting a decrease in state revenue not an increase.
> >
> > DOR: I'm sorry.  I meant that any campaign spending would generate.
>
> 6.     The Fiscal Note includes the following language allegedly summarizing the Department of Revenue's responses:
>
> > [T]he Department of Revenue indicated this initiative petition will have no impact on their department.  The officials indicated they had no way of measuring the proposals [*sic*] economic impact.
>
> 6. [*sic*] Mr. Halwes testified that the Department of Revenue did not do revenue projections or have economists on staff and further identified that the Department of Revenue reported staff and expenses impact only on prior tax revenue matters in Exhibits 16 and 17.

Based upon these findings, the trial court concluded that the Department of Revenue's submission was unreasonable.  The trial court concluded that

> The Department had not reviewed the submission sent to the Department by the Auditor and that the Department did not understand the Auditor's request….

9

[T]he Auditor 'summarized' the unreasonable response in the Fiscal Note itself. The Fiscal Note is insufficient and unfair because it included the unreasonable submission of the Department of Revenue.

The trial court concluded that the Department of Revenue did not review the Ellinger Submission, despite the email explicitly stating "*after reviewing the proposed statement of fiscal impact* [(the Ellinger Submission)], this does not change our response to the fiscal note." (emphasis added). In its findings of fact section, the trial court goes so far as to omit that portion of the email exchange between the auditor's office and the Department, replacing it with an ellipsis. Regardless of the trial court's ignoring the Department's explicit confirmation that it did review the Ellinger Submission, the trial court's conclusion that the Department's submission was not reasonable is erroneous. The trial court did not find, and the record does not support a finding, that the Department of Revenue's submission diverged from the issue of the Initiative. Rather, it addressed the issue of the Initiative directly, stating that "[t]his initiative will have no impact on the Department."

Although the auditor *may* conduct a follow-up inquiry with an entity whose submission raises additional questions or appears incomplete, *Brown*, 370 S.W.3d at 649, there is no authority *requiring* that the auditor send any entity the submission of another entity for review nor *requiring* any entity to respond to the auditor's request for submissions at all, much less to comply with a request to review the submission of another entity and comment on such submission. In fact, the auditor's standard communication to the entities from which he solicits submissions regarding an initiative petition reads, in relevant part: "The State Auditor's Office has received the attached initiative petition. Please review the petition and determine the estimated cost or savings, if any, this measure would have on *your* state or local government entity." (emphasis added). Furthermore, there was no communication from the auditor's office

10

until just days before the deadline requesting that the Department of Revenue comment on the revenue impact to the state and on the Ellinger Submission's conclusions on the Initiative's impact on state revenues, rather than just "the estimated cost or savings, if any… on your state or local government entity" as initially requested.

The trial court may have confused "reasonable" in the legal sense with the failure of the Department of Revenue to comply with the "reasonable" request of the auditor. The auditor repeatedly requested the Department of Revenue to respond in some fashion to the conclusion from the Ellinger Submission that the proposal would have a negative impact on state revenue. The Department of Revenue assiduously avoided doing so, first commenting only as to the potential impact on the Department, then, when pressed, pleading ignorance rather than addressing the issue.

Nothing in the record indicates that the submission of the Department of Revenue diverged from or did not address the particular issue of the Initiative. Because the Department's submission addressed and did not diverge from the particular issue of the Initiative, it was reasonable. *Brown*, 370 S.W.3d at 649. Because the Department's submission was reasonable, the trial court erred in remanding the fiscal note for the preparation of a new fiscal note. Point I is granted.

## II. The Fiscal Note Summary Was Not Insufficient or Unfair

The trial court's conclusion that the fiscal note summary was insufficient and unfair is anchored in its determination that the estimate of lost revenue in the Ellinger Submission should have been included in the fiscal note summary.

The trial court's findings of fact relating to the sufficiency and fairness of the fiscal note summary recited the testimony of Mr. Halwes regarding the Ellinger Submission:

11

16. [H]e found the Ellinger Submission both reasonable and complete.

17. [H]e found the numbers in the Ellinger Submission to be verifiable and . . . he had no submissions or facts before him to cast doubt on such numbers.

18. [I]t was his belief that the numbers in the Ellinger Submission were "speculative" based on his beliefs about the effects of the proposed measure.

19. [H]e had no experience or training in campaign matters, campaign finance matters or in economics or economic projections.

20. [H]e did not conduct any additional or independent research on the economic impact of campaign spending, and . . . he did not examine the effects that such campaign contribution limitations have had in other states.

21. [N]o submission conflicted with or called into question the Ellinger submission.

22. [H]e reviewed the documents and references in the Ellinger submission and they supported the estimates in the submission.

23. No submissions to the State Auditor suggest the numbers of the Ellinger Submission are "speculative."

. . . .

26. No submissions before the Auditor suggested a "positive impact["] to revenues for either state or local government entities.

Based on these findings of fact, the trial court concluded that the portion of the fiscal note summary stating "[a]ny potential impact to revenues for state and local government entities is unknown" was insufficient and unfair. The trial court further concluded that the fiscal note summary must reflect the numbers in the Ellinger Submission, which claimed that state government revenue would decrease at least $7.39 million per year, that state government cost would increase at least $127,000 annually, that there would be one time state government costs of about $50,000, and that annual local government revenue would decrease by at least $1.2 million.

The trial court reasoned that (1) the only substantive responses as to local entities were the Ellinger Submission, indicating a more than $1.2 million negative impact and supported by

12

verifiable source citations, and the City of Columbia's statement that "it is impossible for the city to determine if this would increase or decrease contributions," and (2) there were no submissions suggesting a positive impact on local governmental entities; therefore, to be sufficient and fair the fiscal note summary should have indicated that the impact to revenues of local government entities would be negative. The trial court also reasoned that (1) the only substantive responses as to state revenue impact were the Ellinger Submission, indicating a more than $7.3 million negative impact, and the Department of Revenue's communications, which "did not . . . cast doubt on the underlying assumptions or accuracy of the numbers in the Ellinger Submission[,]" (2) the estimate in the Ellinger Submission was "the only number in a reasonable submission that was provided to the Auditor[,]" and (3) no submissions indicated that the impact to state revenue was unknown or would not be negative; therefore, the fiscal note summary should have indicated that the impact to state revenue would be negative.

The trial court further concluded that the numbers from the Ellinger Submission should be reflected in the fiscal note summary because they constituted an "exact estimate with data that is verifiable[,]" and "[t]here is no basis in any of the submission[s] to the Auditor for [his] finding" that "the numbers in the Ellinger submission were speculative."

The fiscal note summary is required to be sufficient and fair pursuant to section 116.190.3. Insufficient in this context means "inadequate; especially lacking adequate power, capacity, or competence[,]" and unfair means "marked by injustice, partiality, or deception." *Brown*, 370 S.W.3d at 653. Thus, the language of a fiscal note summary is considered sufficient and fair if it "adequately and without bias, prejudice, or favoritism synopsize[s] the fiscal note." *Id.* at 654. It is important to note that a fiscal note summary is not required to "use the 'best' language, set out all details of the proposed measure, or inform voters of an express amount of

13

potential costs of the initiative[,]" but rather to use fair language. *Id.* at 662, 654. The fifty-word limit of the fiscal note summary necessitates "the exclusion of specific fiscal impact details that might improve the summary but that are not required for it to be upheld as sufficient and fair." *Id.* at 667. The fiscal note summary must meet its purpose of "informing the public about the proposed initiative's potential fiscal consequences . . . without using language that is likely to cause bias, prejudice, deception, or favoritism for or against the proposal." *Id.* at 662.

The following is the information received by the auditor that went into drafting the fiscal note and fiscal note summary for the initiative in this case. The auditor sought comments from fifty-one state agencies or other political subdivisions or entities. Twenty-five of those entities responded, and Marc Ellinger also responded as an opponent of the proposal with a proposed statement of fiscal impact. Eleven reported there would be no fiscal impact.

The Department of Elementary and Secondary Education reported there would be no anticipated state cost associated with the proposal. Officials from the Department of Higher Education said they do not anticipate that the proposal would have any direct, foreseeable fiscal impact on their department. The Department of Insurance, Financial Institutions and Professional Registration reported that the proposal will have no cost or savings to the department. Officials from the Department of Mental Health said the proposal creates no direct obligations or requirements to their department that would result in a fiscal impact. The Department of Natural Resources did not anticipate a direct fiscal impact from the proposal. Officials from the Department of Revenue indicated the proposal will have no impact on their department, and said they had no way of measuring the proposal's economic impact. Officials from the Department of Social Services said there is no direct fiscal impact to their department. The Department of Conservation reported that no adverse fiscal impact to their department

14

would be expected as a result of the proposal. Officials from the City of Jefferson indicated that they do not believe there will be a fiscal impact if the proposal becomes law. Officials from the City of Raymore reported that they do not anticipate any fiscal impact.

The Attorney General's office assumed that any potential costs could be absorbed with existing resources, but said it may seek future additional appropriations if significant litigation results. Officials from the Secretary of State's office said they assume, for the purposes of the proposal, that they should have the full appropriation authority they need to meet publishing requirements, but they said they reserved the right to request funding to meet the cost of their publishing requirements if the amount is changed or the estimated nature of their appropriation is changed.

The Department of Corrections said the penalty provisions of the proposal have potential fiscal impact but currently the number of new commitments which may result from the creation of the offence(s) outlined in the proposal could not be predicted. If additional persons are sentenced due to the penalty provisions, the department would incur increased direct offender costs through incarceration (FY12 average $17.059 per offender per day, annual cost of $6,227 per inmate) or supervision by the Board of Probation and Parole (FY12 average $4.960 per offender per day, annual cost of $1,810 per offender). Officials from the Missouri Ethics Commission said the total cost for salaries, fringe benefits, equipment and expenses, local assistance, and other costs will be $118,152 for FY 2014, $121,113 for FY 2015, and $122,339 for FY 2016.

Officials from the City of Columbia said the proposal appears to affect contributions to committees that form to influence the result of local ballot issue elections, but it is impossible for the city to determine if this would increase or decrease contributions and, as a result, the

15

potential for passage of issues for capital improvements. However, Mr. Halwes testified that the $2,600 cap on campaign contributions would not apply to local ballot issues and ballot measure committees.

The Ellinger Submission, as discussed previously, consisted of an analysis and attached cited sources. The analysis concluded that state government revenue would decrease at least $7.39 million per year, state government cost would increase at least $127,000 annually and there would be one time state government costs of about $50,000. It concluded that annual local government revenue would decrease by at least $1.2 million. However, it conceded that "there has not been a comprehensive study regarding the fiscal impact of state elections on Missouri state and local governments," and contained no such economic study. Furthermore, the Ellinger Submission purported to extrapolate from figures from Governor Nixon's 2012 campaign to all other statewide campaigns for all future years. It claimed to predict with precision the actual fiscal impact on state and local tax revenues that would result from such anticipated decreases in campaign spending.

Mr. Halwes testified that he had many concerns about the speculations and assumptions of the Ellinger Submission. Specifically, he found fault with the Ellinger Submission's assumption that the percentage of campaign contributions to Governor Nixon's campaign in a gubernatorial election year that would be affected by the proposed limit would be the same for the campaigns in other years and for other offices. Mr. Halwes also reasoned that if the proposed initiative campaign limitations went into effect, campaigns would be run differently and the amounts collected would not necessarily simply decrease by the amount of past contributions that exceeded the new limit.

16

Simply put, the auditor found the Ellinger Submission speculative and, as such, discounted it. The trial court found that because the Ellinger Submission was the only prognostication submitted to the auditor, it had to be accepted and set forth in the fiscal note and reflected to some degree in the fiscal note summary. This is not the law and diminishes the role of the auditor in the production of the fiscal note and fiscal note summary.

The fiscal note summary drafted by the auditor stated the following in full for the initiative in this case: "It is estimated this proposal will increase state government costs by at least $118,000 annually and have an unknown change in costs for local government entities. Any potential impact to revenues for state and local governments is unknown." Based on the submissions before the auditor, the characterization of any potential impact to revenues for state and local governments as "unknown" is "adequate[] and without bias, prejudice, or favoritism[.]" *Brown*, 370 S.W.3d at 654. The majority of submissions indicated that there would be either no impact or no "direct[,]" "foreseeable[,]" or "adverse" impact, or in some way indicated they at least did not anticipate such impact. The use of the word "unknown" does not necessarily convey that a possibility of a positive impact to state or local revenues is anticipated or estimated, and adequately fulfills the fiscal note summary's purpose of "informing the public about the proposed initiative's potential fiscal consequences . . . without using language that is likely to cause bias, prejudice, deception, or favoritism for or against the proposal." *Brown*, 370 S.W.3d at 662. Even if the fiscal note summary does not "use the 'best' language, set out all details of the proposed measure, or inform voters of an express amount of potential costs of the initiative[,]" *id.*, it does "adequately and without bias, prejudice, or favoritism synopsize the fiscal note." *Id.* at 654.

17

Use of the word "unknown" in the fiscal note summary to characterize potential impact to revenues for state and local governments is sufficient and fair. The fifty-word limit of the fiscal note summary necessitates "the exclusion of specific fiscal impact details[,]" such as those contained in the Ellinger Submission, which "might improve the summary but that are not required for it to be upheld as sufficient and fair." *Id.* at 667. Therefore, the trial court erred in remanding the fiscal note summary for preparation of a new fiscal note summary. Point II is granted.

The judgment is reversed and the case is remanded for entry of judgment consistent with this opinion.

_____
VICTOR C. HOWARD, JUDGE

All concur.

18