

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| JIM BOEVING, | ) | |
| Respondent-Appellant, | ) | |
| | ) | |
| v. | ) | **WD79694** |
| | ) | **(consolidated with** |
| MISSOURI SECRETARY OF | ) | **WD79697 and WD79725)** |
| STATE JASON KANDER, | ) | |
| Respondent, | ) | FILED: July 8, 2016 |
| | ) | |
| MISSOURI STATE AUDITOR | ) | |
| NICOLE GALLOWAY, RAISE | ) | |
| YOUR HAND FOR KIDS and | ) | |
| ERIN BROWER, | ) | |
| Appellants-Respondents. | ) | |

**Appeal from the Circuit Court of Cole County**
**The Honorable Daniel R. Green, Judge**

**Before Special Division: Alok Ahuja, P.J., and Thomas H. Newton**
**and Gary D. Witt, JJ.**

Missouri resident and taxpayer Jim Boeving filed suit in the Circuit Court of Cole County to challenge the fairness and sufficiency of the official ballot title for an initiative petition. The petition seeks to amend the Missouri constitution to increase the taxes and fees to be paid on the sale of cigarettes, and to use the revenues to fund programs addressing children's health and education.

The circuit court rejected Boeving's challenge to the summary statement prepared by the Secretary of State. But the court agreed with Boeving that the fiscal note summary prepared by the State Auditor was insufficient and unfair. State Auditor Nicole Galloway, and ballot initiative proponents Raise Your Hand

for Kids and Erin Brower, appeal the trial court's ruling that the ballot title's fiscal note summary was insufficient. Boeving cross-appeals the circuit court's conclusion that the summary statement was adequate. We conclude that, while the fiscal note summary is fair and sufficient, the summary statement is not. We accordingly reverse, and certify to the Secretary of State modified language for the summary statement.

**Factual Background**

On November 20, 2015, Raise Your Hand for Kids submitted an initiative petition sample sheet to the Secretary of State. Raise Your Hand is a Missouri not-for-profit corporation and campaign committee formed under Missouri law to support the petition.

The initiative petition seeks to amend Article IV of the Missouri constitution by adding new §§ 54, 54(a), 54(b), and 54(c). Several features of the initiative petition are relevant to the issues on appeal.

First, the proposed constitutional amendment imposes a new tax on the retail sale of cigarettes. New § 54(c).1 provides:

> In addition to any tax levied upon the sale of cigarettes in this state, a tax shall be levied upon the sale of cigarettes in an amount equal to thirty mills per cigarette (or sixty cents per pack of twenty cigarettes) phased in, in four equal annual increments of seven and one-half mills (or fifteen cents per pack of twenty cigarettes) on January 1, 2017, January 1, 2018, January 1, 2019 and January 1, 2020.

Section 54(c).2.a provides that, "[i]n addition to the tax provided in section 54(c).1, effective January 1, 2017, an equity assessment fee is imposed upon the first to occur of the following: the purchase, storage, use, consumption, handling, distribution or wholesale sale of each package of twenty (20) cigarettes manufactured by a non-participating manufacturer." "Non-participating manufacturers" are those who are not parties to the Master Settlement Agreement

2

entered into by the State and certain tobacco manufacturers on November 23, 1998. The petition specifies that "[t]he equity assessment fee shall be paid by the wholesaler, and collected by the director of revenue at the same time cigarette tax stamps are purchased from the director of revenue." Section 54(c).2.b states that, as an initial matter, "[t]he rate of the equity assessment fee shall be sixty-seven cents ($0.67) per package of twenty (20) cigarettes," but that "[b]eginning with equity assessment fees due in 2018, the equity assessment fee shall be adjusted each year in accordance with the Inflation Adjustment in the Master Settlement Agreement." The parties agree that application of the Inflation Adjustment will require an annual increase in the equity assessment fee of 3% or the annual increase in the Consumer Price Index, whichever is greater.

The proposed amendment provides that the funds generated by the new taxes and fees will be deposited in a newly created Early Childhood Health and Education Trust Fund, which "shall be kept separate from the general revenue fund as well as any other funds or accounts in the state treasury." The proposed amendment specifies the following uses for monies in the Fund:

- "[a]t least seventy-five percent (75%) of funds shall be disbursed in grants for improving the quality and increasing access to Missouri early childhood education programs";

- "[n]o less than ten percent (10%) and no more than fifteen percent (15%) of funds shall be disbursed in grants to Missouri hospitals or other health care facilities to improve access to quality early childhood health and development programs"; and

- "[n]o less than five percent (5%) and no more than ten percent (10%) of funds shall be disbursed in grants to provide evidence-based smoking cessation and prevention programs for Missouri pregnant mothers and youth."

The proposed amendment specifies that funds shall not "be used for human cloning or research, clinical trials, or therapies or cures using human embryonic stem cells, as defined in Article III, section 38(d)." The amendment also provides that the distribution of funds under the amendment will be exempt from the

3

restrictions of Article IX, § 8 of the Missouri constitution. Article IX, § 8 generally prohibits the State and its political subdivisions from distributing State or local funds or property "in aid of any religious creed, church or sectarian purpose," or in support of any educational institution "controlled by any religious creed, church or sectarian denomination."

Finally, the initiative petition contains a "hold harmless" provision which requires that,

> [o]n an annual basis, the director of revenue, in consultation with the director of health and senior services, shall determine whether the taxes imposed by section 54(c) have resulted in a decrease in consumption of tobacco products and thereby directly caused a reduction in the amount of moneys collected and deposited in the fair share fund, the health initiatives fund, or the state school moneys fund, revenues generated from local tobacco taxes, or revenues generated from local sales taxes.

If such revenue reductions are found, monies in the Fund shall be transferred to the entities experiencing the revenue decreases, provided that the aggregate amount of "hold harmless" payments in any year "shall not exceed four percent (4%) of the total moneys collected pursuant to this section during that same year."

On January 5, 2016, the Secretary of State certified the official ballot title for the petition. An official ballot title consists of a summary statement prepared by the Secretary of State, as well as a fiscal note summary prepared by the State Auditor. *See* §§ 116.010(4), 116.175, 116.334[1]; *Brown v. Carnahan*, 370 S.W.3d 637, 646 (Mo. banc 2012). As certified, the official ballot title reads:

Shall the Missouri Constitution be amended to:

- increase taxes on cigarettes each year through 2020, at which point this additional tax will total 60 cents per pack of 20;

- create a fee paid by cigarette wholesalers of 67 cents per pack of 20 on certain cigarettes; and

---

[1] Statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the most recent cumulative and non-cumulative supplements.

4

- deposit funds generated by these taxes and fees into a newly established Early Childhood Health and Education Trust Fund?

When cigarette tax increases are fully implemented, estimated additional revenue to state government is $263 million to $374 million annually, with limited estimated implementation costs. The revenue will fund only programs and services allowed by the proposal. The fiscal impact to local governmental entities is unknown.

Boeving filed suit in the Circuit Court of Cole County on January 15, 2016, contending that both the summary statement and fiscal note summary were insufficient and unfair. As required by § 116.190.2, Boeving's action named Secretary of State Jason Kander and State Auditor Nicole Galloway as defendants. Raise Your Hand, and its Treasurer Erin Brower, were later granted leave to intervene. (In this opinion we refer to Raise Your Hand and Brower collectively as "Raise Your Hand.")

Following a bench trial, the circuit court entered its final judgment on May 19, 2016. The court found the ballot title's summary statement to be adequate, but agreed with Boeving that the fiscal note summary was insufficient and unfair. With respect to the summary statement, the circuit court found that the statement that the initiative would "create a fee . . . of 67 cents per pack" "could be misleading," because "there is nothing in this summary statement that would give notice to the voters that the fee will increase annually or that would give an indication that the voter should investigate the fee mechanism further." The circuit court also found that the summary statement "fails to provide notice to a voter as to how the fund proceeds will be used," and makes no reference to the initiative's "significant departure from Missouri's current constitutional prohibition on appropriations from public funds to religious educational organizations." Despite these deficiencies, the circuit court concluded that the summary statement was "not insufficient and unfair."

5

With respect to the fiscal note summary, the circuit court found that the Auditor had unreasonably included the figure of $374 million as the upper bound of potential State revenue increases. This figure was derived from the fiscal submission prepared by the Department of Revenue. The Department of Revenue's estimate of the increase in State revenues assumed that future sales of cigarettes remained unchanged, meaning that there would be no decrease in cigarette consumption due to the imposition of the new taxes and fees. Based on expert economic testimony presented by Boeving, the circuit court concluded that the Department of Revenue's assumption of a "zero price elasticity of demand" was unreasonable, and that its fiscal submission "should therefore not have [been] used . . . in the fiscal note summary."

The circuit court also concluded that the statement in the fiscal note summary that "[t]he fiscal impact to local governmental entities is unknown" was unfair and insufficient. The court noted that the Office of Administration had calculated a $10.4 million loss in local government revenues, and concluded that the Auditor's determination "that the hold harmless [provision] would definitely apply [to compensate for this revenue decline] was deceptively speculative."

The State Auditor and Raise Your Hand appeal the trial court's determination that the fiscal note summary is inadequate. Boeving cross-appeals the trial court's conclusion that the summary statement was fair and sufficient.

**Appellate Jurisdiction**

"Before we can address the merits of an appeal, 'this court has a duty to determine *sua sponte* whether we have jurisdiction to review the appeal.'" *Capital Fin. Loans, LLC v. Read*, 476 S.W.3d 925, 927 (Mo. App. W.D. 2015) (citation omitted). "If this Court lacks jurisdiction to entertain an appeal, the appeal must be dismissed." *Fannie Mae v. Truong*, 361 S.W.3d 400, 403 (Mo. banc 2012) (citation omitted).

6

"In Missouri, the right to appeal is purely statutory, and 'where a statute does not give a right to appeal, no right exists.'" *Fannie Mae*, 361 S.W.3d at 403 (quoting *Farinella v. Croft*, 922 S.W.2d 755, 756 (Mo. banc 1996)). "'An appeal without statutory sanction confers no authority upon an appellate court except to enter an order dismissing the appeal.'" *Id.* at 405 (quoting *Farinella*, 922 S.W.2d at 757-58).

In this case, the appellants rely on § 116.190.4 to establish their right to appeal. Section 116.190.4 provides in relevant part that, in suits challenging the terms of an official ballot title, "[a]ny party to the suit may appeal *to the supreme court* within ten days after a circuit court decision." (Emphasis added.) Section 116.190.4 makes no reference to an appeal to this Court.

Although § 116.190.4 authorizes an appeal only "to the supreme court," we conclude that we have jurisdiction over these appeals. *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824 (Mo. banc 1990), interpreted the similar appeal-authorization language found in another election law, § 116.200.3, RSMo. The Supreme Court observed that "[t]he appeal was initially filed in this Court but, due to a lack of jurisdiction, the cause was transferred to the Missouri Court of Appeals, Western District." *Id.* at 826 (footnote omitted). The Court offered the following explanation in the accompanying footnote:

> Section 116.200.3, RSMo 1986, purports to grant a party to an action such as this the right to appeal to the Supreme Court. However, our appellate jurisdiction is constitutionally defined and limited to specific situations, none of which exists here. *See Mo.Const. art. V, § 3.*

*Id.* at 826 n.1.

The discussion in *Missourians to Protect the Initiative Process* holds that, although the legislature may purport to grant a direct right of appeal to the Supreme Court by statute, such direct appeals are only authorized if an appeal otherwise falls within the scope of the Supreme Court's exclusive appellate

7

jurisdiction as specified in Article V, § 3 of the Missouri constitution. According to *Missourians to Protect the Initiative Process*, the legislature cannot expand the scope of the Supreme Court's direct appellate jurisdiction beyond the categories of cases specified in Article V, § 3.

This appeal does not raise any issue which would trigger the Supreme Court's exclusive appellate jurisdiction. Therefore, § 116.190.4 cannot be read to authorize a direct appeal to the Supreme Court. Because Article V, § 3 provides that "[t]he court of appeals shall have general appellate jurisdiction in all cases except those within the exclusive jurisdiction of the supreme court," this appeal was properly filed here.

## Standard of Review

> As in any court-tried matter, we will sustain the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Where . . . the parties simply argue the fairness and sufficiency of the [fiscal note summary or] summary statement based upon stipulated facts, joint exhibits, and undisputed facts, the only question on appeal is whether the trial court drew the proper legal conclusions, which we review *de novo*.

*Billington v. Carnahan*, 380 S.W.3d 586, 591 (Mo.App. W.D. 2012).

## Analysis

In *Brown v. Carnahan*, 370 S.W.3d 637 (Mo. banc 2012), the Supreme Court provided a detailed description of the legal standards which apply to both summary statements and fiscal note summaries. "Secretary of state summary statements and auditor fiscal notes and fiscal note summaries are required by section 116.190.3 to be sufficient and fair." *Id.* at 653. "When reviewing whether the secretary of state and the auditor have complied with the fairness and sufficiency requirements under section 116.190, this Court considers that insufficient means inadequate; especially lacking adequate power, capacity, or competence, and unfair means to be marked by injustice, partiality, or deception." *Id.*

8

The secretary of state's summary statement must be concise and cannot be intentionally argumentative or likely to create prejudice. To create such a summary statement that is not insufficient or unfair, the summary statement must be adequate and state the consequences of the initiative without bias, prejudice, deception, or favoritism. The language used should fairly and impartially summarize the purposes of the measure so that voters will not be deceived or misled. It should accurately reflect the legal and probable effects of the proposed initiative. Sometimes it is necessary for the secretary of state's summary statement to provide a context reference that will enable voters to understand the effect of the proposed change.

Section 116.175.3 instructs the auditor to prepare a fiscal note and fiscal note summary for a proposed initiative that "state[s] the measure's estimated cost or savings, if any, to state or local governmental entities." In the context of requiring a fair and sufficient fiscal note by the state auditor, the words insufficient and unfair mean to inadequately and with bias, prejudice, deception and/or favoritism state the fiscal consequences of the proposed proposition. Similarly, in examining the fairness and sufficiency of the fiscal note summary, the summary's words are considered sufficient and fair where they adequately and without bias, prejudice, or favoritism synopsize the fiscal note. A fiscal note summary is not judged on whether it is the "best" language, only on whether it is fair.

Requiring fairness and sufficiency of an initiative's summary statement, fiscal note, and fiscal note summary reflects that there are procedural safeguards in the initiative process that are designed either, (1) to promote an informed understanding by the people of the probable effects of the proposed amendment, or (2) to prevent a self-serving faction from imposing its will upon the people without their full realization of the effects of the amendment. Initiative process safeguards assure that the desirability of the proposed amendment may be best judged by the people in the voting booth.

*Id.* at 654 (other citations and internal quotation marks omitted); *see also*, *e.g.*, *Dotson v. Kander*, 464 S.W.3d 190, 195-96 (Mo. banc 2015); *Shoemyer v. Mo. Sec'y of State*, 464 S.W.3d 171, 174 (Mo. banc 2015); *State ex rel. Kander v. Green*, 462 S.W.3d 844, 849-852 (Mo. App. W.D. 2015).

**I.**

We first address Boeving's challenge to the summary statement, which he has raised in a cross-appeal.

The Secretary of State's summary statement provides in full:

9

Shall the Missouri Constitution be amended to:

- increase taxes on cigarettes each year through 2020, at which point this additional tax will total 60 cents per pack of 20;

- create a fee paid by cigarette wholesalers of 67 cents per pack of 20 on certain cigarettes; and

- deposit funds generated by these taxes and fees into a newly established Early Childhood Health and Education Trust Fund?

Although the trial court found the summary statement to be adequate, Boeving argues that both the second and third bullet points are unfair and insufficient. We consider these issues in turn.

**A.**

Boeving argues that the second bullet point is unfair and insufficient because it does not mention that the equity assessment fee is mandated to increase annually, in perpetuity, by the greater of 3% or the annual increase in the Consumer Price Index. We agree.

As the trial court noted, although the equity assessment fee will initially be set at 67 cents per pack of cigarettes in 2017, it is required to be increased every year "in accordance with the Inflation Adjustment" in the Master Settlement Agreement. That Inflation Adjustment will result in an annual increase in the equity assessment fee of at least 3%, or more if the annual change to the Consumer Price Index is higher. The Inflation Adjustment is subject to compounding, meaning that it operates every year on the adjusted equity assessment fee in the immediately preceding year.

The trial court itself observed that the second bullet point "could be misleading," because "there is nothing in this summary statement that would give notice to the voters that the fee will increase annually or that would give an indication that the voter should investigate the fee mechanism further." We agree that the second bullet point, as written, is likely to mislead voters, and fails to

10

accurately summarize the equity assessment fee which the initiative petition proposes to establish. The second bullet point asks voters whether the Missouri constitution should be amended to "create a fee . . . of 67 cents per pack of 20." The initiative petition does not propose to establish a 67-cent fee, however. It proposes to establish – in the Missouri constitution – an equity assessment fee which will *begin* at 67 cents, but which will increase every year, forever, by the greater of 3% or the increase in the Consumer Price Index. The statement that the initiative will "create a fee . . . of 67 cents" would suggest to a reasonable voter that the fee is established as an unchanging sum-certain. But that is not true. While the initiative petition establishes 67 cents as the benchmark at which the fee will originate, the fee is required to increase annually from there. As the circuit court recognized, nothing in the summary statement would alert a voter to this mandatory, perpetual, annual increase in the equity assessment fee, or would signal that the voter should investigate the issue further before voting.

The misleading nature of the second bullet point is heightened when it is considered in context. The first bullet point states in clear language that the new retail sales tax will "increase . . . each year through 2020, at which point this additional tax will total 60 cents per pack." Thus, the first bullet point clearly advises voters that the retail sales tax will be subject to annual increases through 2020; it also tells voters the final, highest monetary amount of the tax, which will be applicable in 2020 and thereafter. Given the wording of the first bullet point, voters would reasonably expect that the second bullet point would similarly describe any increases in the equity assessment fee. By failing to do so, the second bullet point would mislead voters into believing that the fee is *not* subject to further increases, but instead represents a definite, fixed 67-cent assessment. As Boeving argues, the two bullet points read together will leave voters "with the clear impression that the tax increases, but the fee remains constant." This is clearly not the case.

11

The requirement that the equity assessment fee increase annually by 3% or more "is a central feature of [the proposed constitutional amendment], and a fact of which voters are entitled to be informed." *Seay v. Jones*, 439 S.W.3d 881, 891 (Mo. App. W.D. 2014). The desirability of mandatory, annual, inflation-based increases has been the subject of substantial public debate, in connection with (for example) the minimum wage, public-employee compensation, governmental benefits such as Social Security, and income tax rates and brackets. These policy debates have concerned not only *whether* to adopt or continue an inflation-based escalator, but also *what measure* best reflects inflation or cost-of-living increases. It is significant that in this case the equity assessment fee will, over time, inevitably increase *more than* the increase in the Consumer Price Index, since the initiative petition requires a minimum annual increase of 3%, even when the increase in the Consumer Price Index is lower. As an example, in the ten years from 2006 to 2015, the Consumer Price Index for All Urban Consumers (the measure specified in the Master Settlement Agreement) increased by 3% or more in only two years.[2] Therefore, in the other *eight* years, the equity assessment fee would have increased at a rate *greater than* the Consumer Price Index. The fact that the initiative petition adopts a "Consumer Price Index-plus" annual increase factor is not simply an incidental detail of the proposal. *Cf. Protect Consumers' Access To Quality Home Care Coal., LLC v. Kander*, WD 79100, 2015 WL 7252587, at *3 (Mo.App. W.D. Nov. 17, 2015) (finding summary statement inadequate where it referred to "in-home service providers," but "g[a]ve[ ] no indication as to what types of services are contemplated or under what programs").[3]

---

[2]     *See* Bureau of Labor Statistics, *CPI Detailed Report: Data for May 2016*, Table 24 (available at http://www.bls.gov/cpi/cpi_dr.htm#2016 (last visited on July 5, 2016)).

[3]     Although it has not yet been published in the SOUTHWESTERN REPORTER, the *Protect Consumers' Access* decision is final, and has the precedential value of any published opinion of this Court. A post-disposition application for transfer filed in this Court was denied on December 22, 2015, and an application for transfer filed in the Supreme Court

The Secretary of State and Raise Your Hand argue that the second bullet point satisfies the standards found in *Brown v. Carnahan*, 370 S.W.3d 637, despite its failure to make any reference to the Inflation Adjustment. The *Brown* appeal involved three consolidated cases, which challenged the official ballot titles for three different initiatives. In each case, the plaintiffs challenged the fairness and sufficiency of both the summary statements and fiscal note summaries. The Secretary of State and Raise Your Hand rely on the Supreme Court's discussion of the summary statements for two of the initiatives. In the first, the summary statement for a minimum-wage initiative asked voters whether Missouri law should be amended to "increase the state minimum wage to $8.25 per hour, or to the federal minimum wage if that is higher, and adjust the state wage annually based upon changes in the Consumer Price Index." *Id.* at 660 (quoting summary statement). Among other things, the plaintiff argued

> that the summary statement is unfair and insufficient because it fails to explain adequately and accurately how the proposed minimum wage initiative would result in state minimum wage adjustments based on changes to the federal minimum wage. He contends that the summary statement fails to explain to voters that the proposed initiative would create a new "super-escalator" scheme whereby Missouri's state minimum wage would be increased to meet the federal minimum wage if the federal minimum wage is higher and then still be subject to increases based on the application of the CPI. He argues that voters are not informed fully by the summary statement that it is likely under the proposed measure that the state's minimum wage will increase annually.

*Id.* at 661.

The Supreme Court rejected this challenge, and found the summary statement for the minimum-wage initiative to be fair and sufficient. The Court agreed with the Secretary of State "that setting out a separate explanation of the 'super-escalator' provision was not necessary to render the summary statement fair

was denied on December 28, 2015. No. SC95447. We issued our mandate in the case on December 29, 2015.

13

and sufficient"; the Court emphasized that "the summary statement 'need not set out the details of the proposal' to be fair and sufficient." *Id.* (citation omitted).

The Secretary of State and Raise Your Hand argue that *Brown* holds that an inflation-based adjustment factor in an initiative petition is merely a "detail" of the proposal, which need not be described in the summary statement. We believe that they read this aspect of the *Brown* decision far too broadly. In *Brown*, the minimum-wage summary statement *already* stated that the state minimum wage would be increased to $8.25 per hour "or to the federal minimum wage if that is higher," "**and**" that the state minimum wage would be "adjust[ed] . . . annually based upon changes in the Consumer Price Index." Thus, the existing summary statement already explained that (1) benchmarking the state minimum wage to the federal minimum wage, and (2) adjusting the state minimum wage annually based on changes in the Consumer Price Index, would operate together (not as mutually exclusive alternatives). Given the existing description of the proposed state minimum wage formula, the Court merely held that the Secretary of State was not required to include a "separate," additional explanation of the fact that the two features would work together. *Brown* held that the Secretary of State's existing description of the Consumer Price Index escalator was adequate; it did not hold that it was unnecessary to include *any* description of that escalation factor.

Raise Your Hand also relies on *Brown*'s discussing of a separate initiative, which sought to place limits on the interest and fees which could be charged by certain consumer lenders. The summary statement for that initiative asked: "Shall Missouri law be amended to limit the annual rate of interests, fees, and finance charges for payday, title, installment, and consumer credit loans and prohibit such lenders from using other transactions to avoid the rate limit?" 370 S.W.3d at 663 (quoting summary statement). The circuit court held that the summary statement was unfair and insufficient, because "the initiative's impact – i.e. its "probable

14

effect" – on businesses, consumers, and governmental entities, is not tied to the mere *existence* of a "limit," but rather, it depends on *what* that "limit" is.'" *Id.* (quoting circuit court's judgment). The circuit court accordingly certified an amended summary statement, which specified that the initiative would impose an annual limit "of 36 [percent]" on the interest, fees, and finance charges which lenders charged. *Id.*

The Supreme Court reversed. It explained:

> Here, the secretary of state prepared a summary statement that was accurate as to the purpose of the initiative – to limit the permissible interest rate for certain types of loans – and there was no requirement to articulate specifically the proposed 36–percent rate limit. That the court might believe that the additional information about the rate limit would render a better summary is not the test. *See Bergman v. Mills*, 988 S.W.2d 84, 92 (Mo. App. [W.D.] 1999) (rejecting claims by an initiative's opponents who alleged that the secretary of state's summary statement for the initiative was vague, ambiguous, and insufficient; finding that "even if the language proposed by [the opponents] is more specific, and even if that level of specificity might be preferable, whether the summary statement prepared by the Secretary of State is the best language for describing the referendum is not the test").

370 S.W.3d at 664. "Because the secretary of state's summary statement language was fair and sufficient in summarizing the purpose of the initiative and was not written in a way that would mislead voters, the trial court erred in rejecting her summary statement." *Id.*

Raise Your Hand argues that this aspect of *Brown* indicates that it is unnecessary for a summary statement to advise voters of the specific numerical or monetary provisions of an initiative, so long as the summary advises voters of the proposal's general purposes. Once again, we conclude that Raise Your Hand reads *Brown* too broadly. Although the summary statement for the payday lending initiative at issue in *Brown* may have been vague or general, the Supreme Court held that the language "was accurate as to the purpose of the initiative," and "was

15

not written in a way that would mislead voters." 370 S.W.3d at 664. As the quotation from *Bergman* makes clear, the Supreme Court held only that *greater specificity* was not required for this "vague but accurate" summary statement.

In the present case, Boeving's challenge to the second bullet point does not argue merely that the description is insufficiently specific. Instead, as we have explained above, Boeving's argument is that the second bullet point is inaccurate and misleading, because it would lead a voter to believe that the equity assessment fee will be set at $.67 for all time. This is not a case of a "vague but accurate" summary; instead, the summary statement in this case is specific, but inaccurate.[4]

Raise Your Hand also contends that application of the Inflation Adjustment to the equity assessment fee is merely a continuation of existing law, and that it was accordingly unnecessary to refer to the Inflation Adjustment in the summary statement. *See Dotson v. Kander*, 464 S.W.3d 190, 196-98 (Mo. banc 2015) (holding that summary statement was not required to reference specific features of initiative where those features did not change existing law). Raise Your Hand points to § 196.1003, which currently requires nonparticipating manufacturers to annually "place into a qualified escrow fund . . . the following amounts [stated in terms of a monetary amount per cigarette sold] (as such amounts are adjusted for inflation)." § 196.1003(b)(1). The required per-cigarette escrow amounts are "adjusted for inflation" using the same Inflation Adjustment employed in the initiative petition. *See* § 196.1000(a).[5]

---

[4]    We recognize that, under *Brown*, it would potentially have been sufficient for the second bullet point to merely advise voters that the initiative would "create a fee paid by cigarette wholesalers on certain cigarettes," without stating any monetary value whatsoever. That is not the case before us, however. Here, the summary statement purported to precisely state the monetary amount of the equity assessment fee; but it did so in a materially inaccurate fashion.

[5]    It is unclear how the $.67 per pack assessment rate imposed by the initative petition compares to the amounts currently required to be escrowed under § 196.1003(b)(1). Section 196.1003(b)(1) provides that the amount required to be escrowed, per cigarette sold, is $.0188482 "for each of 2007 and each year thereafter." The per-unit escrow amount

16

Although § 196.1003 currently requires nonparticipating manufacturers to escrow sums based on cigarettes sold, using a per-cigarette amount which is increased by use of the Inflation Adjustment, the use of the Inflation Adjustment in the initiative petition is not simply a continuation of the legal obligations currently contained in chapter 196. The monies required to be escrowed under § 196.1003(b)(1) are to be used "to pay a judgment or settlement on any released claim brought against such tobacco product manufacturer by the State or any releasing party located or residing in the State." § 196.1003(b)(2)(A). Unless used to fund judgments or settlements, or refunded as an overpayment,[6] escrowed funds "shall be released from escrow and revert back to such tobacco product manufacturer twenty-five years after the date on which they were placed into escrow." § 196.1003(2)(C).

Thus, the escrow fund payments required by § 196.1003 constitute a fundamentally different legal obligation than the equity assessment fee established by the initiative petition. The monies held in escrow are used to secure qualifying judgments and settlements, and are otherwise returned to the manufacturer. The equity assessment fee, by contrast, is paid into the Early Childhood Health and Education Trust Fund, and is immediately available for use by the Fund for the purposes specified in the initiative. Unlike the escrow payments made by a nonparticipating manufacturer under § 196.1003, a wholesaler would have no right

---

specified in the statute would approximate $.38 per pack of 20 cigarettes. This amount has, however, been subject to escalation since 2007 using the Inflation Adjustment. The parties were unable to advise us at oral argument concerning the current per-cigarette or per-pack amount of the escrow payments required by § 196.1003(b)(1).

6    Section 196.1003(b)(2)(B) provides that escrowed funds can be released to the nonparticipating manufacturer if it establishes that an escrow payment it made "was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement . . . had it been a participating manufacturer."

17

to recoup the equity assessment fees that it would pay if the initiative is adopted.[7] Because the equity assessment fee is a fundamentally different legal obligation than the escrow payments required by § 196.1003, the fact that the same Inflation Adjustment is used in the statute and in the proposed constitutional amendment is immaterial. In other words, the fact that the Inflation Adjustment is used in § 196.1003 would not alert voters that the same escalator will be applied to the equity assessment fee created by the initiative petition.

Moreover, *even if* the use of the Inflation Adjustment in the proposed constitutional amendment merely continued existing law, it is well established that "[s]ometimes it is necessary for the secretary of state's summary statement to provide a context reference that will enable voters to understand the effect of the proposed change." *Brown*, 370 S.W.3d at 654; *see also, e.g.*, *Mo. Mun. League v. Carnahan*, 364 S.W.3d 548, 553 (Mo.App. W.D. 2011) ("at least in some instances context demands a reference to what is currently present to understand the effect of the proposed change"). Such a "context reference" would be necessary here, even if the Inflation Adjustment continued existing law. As we have explained above, reporting that the equity assessment fee will be "67 cents," with *no* reference to the fact that the fee will necessarily increase every year, is misleading and inaccurate. Whether it is new or not, the Inflation Adjustment must be referenced in the second bullet point in some fashion to give voters a fair and sufficient summary.

---

[7] It also appears that *the entity paying* the relevant assessments may be different. Section 196.1003 requires escrow payments by "tobacco product manufacturers," § 196.1003 (which may include the first purchaser of cigarettes for resale, if "the manufacturer does not intend [the cigarettes] to be sold in the United States," § 196.1000(i)(2)), while the initiative petition specifies that the equity assessment fee "shall be paid by the wholesaler." Proposed § 54(c).2.a. To the extent § 196.1003 and the initiative petition impose legal obligations on different entities, this would be all the more reason to hold that use of the Inflation Adjustment in § 196.1003 gives no notice of the proposed use of the Inflation Adjustment in the proposed constitutional amendment.

18

We accordingly find that the second bullet point in the summary statement fails to adequately inform voters of the initiative's probable effects, and is therefore unfair and insufficient. We reverse the trial court's contrary determination.

**B.**

Boeving also challenges the summary statement's third bullet point, arguing that it is insufficient and unfair because it fails to inform voters how the proceeds of the initiative would be used. Boeving also asserts that the third bullet point is inadequate because it fails to advise voters that the initiative would permit funds to be disbursed to religious schools, despite the prohibition in Article IX, § 8 of the Missouri constitution, and would prohibit funds from being used for "research, clinical trials, or therapies or cures using human embryonic stem cells," despite the provisions of Article III, § 38(d) of the Missouri constitution.

The trial court acknowledged the third bullet point's potential deficiencies, but nonetheless found that the summary was not unfair or insufficient on this basis. We agree.

As we have explained above, in *Brown v. Carnahan* the Supreme Court approved a summary statement that indicated that the initiative would "limit the permissible interest rate for certain types of [payday] loans," but failed to articulate the specific 36-percent limit proposed. 370 S.W.3d at 664. The Court emphasized that "the summary statement need not set out the details of the proposal to be fair and sufficient. . . . [T]he test is not whether increased specificity would be have been preferable but instead is whether the language used was fair and impartial in summarizing the initiative's purposes." *Id.* at 661. "That the court might believe that the additional information about the rate limit would render a better summary is not the test." *Id.* at 664. Instead, "the important test is whether the language fairly and impartially summarizes the purposes of the initiative." *Id.* at 656 (citation and internal quotation marks omitted).

19

Here, the summary statement accurately advises voters that the revenues generated by the new taxes and fees will be deposited into the Early Childhood Health and Education Trust Fund.  Although the summary statement does not explicitly state the purposes for which revenues will be expended, the name of the Fund accurately – albeit generally – describes the purposes to which funds will be put:  increasing access to early childhood education and health and development programs, and funding smoking cessation and prevention programs targeting pregnant mothers and youth.

Moreover, the fiscal note summary which immediately follows the summary statement advises voters that "[t]he revenue [generated by the proposal] will fund only programs and services allowed by the proposal."  Boeving himself acknowledges that a statement like the one appearing in the fiscal note summary would be sufficient to alert voters to further investigate the uses to which revenues will be put:  in his opening Brief, he argued that, "[a]t a minimum, the Summary Statement should have alerted voters that the revenues would be used for the purposes identified in the measure (to alert voters to go and read the underlying measure)."  While the additional statement appears in the fiscal note summary rather than in the summary statement, the two summaries follow one another in the ballot title, and we are aware of no authority which prevents us from relying on the language of the fiscal note summary to provide voters with additional relevant information.

The language used in the summary statement and fiscal note summary advises voters generally of the purposes for which revenues will be spent, and notifies them that additional details exist in the proposal (which would prompt those interested to make further inquiry).  "The ballot title is sufficient if it makes the subject evident with sufficient clearness to give notice of the purpose to those

interested or affected by the proposal." *Protect Consumers' Access*, 2015 WL 7252587, at *2. The summary statement here does so adequately.

Boeving also argues that the summary statement is deficient for failing to advise voters that it prohibits funding of human embryonic stem-cell research which would otherwise be authorized by Article III, § 38(d) of the Missouri constitution, and fails to advise voters that the initiative creates an exception to Article IX, § 8, which generally prohibits governmental funding of religious educational institutions.

> Within the confines of the word limit, the ballot title is not required to set out the details of the proposal or resolve every peripheral question related thereto. While there may be aspects of the ballot initiative or consequences resulting therefrom that Appellants would have liked to have seen included in the summary statement, their exclusion does not render the summary statement either insufficient or unfair. The test is not whether increased specificity and accuracy would be preferable or provide the best summary; rather, the important test is whether the language fairly and impartially summarizes the purpose of the initiative.

*Archey v. Carnahan*, 373 S.W.3d 528, 533–34 (Mo. App. W.D. 2012) (citations and internal quotation marks omitted); *see also, e.g.*, *Brown*, 370 S.W.3d at 656.

The central features of the initiative petition are the imposition of a new retail sales tax on cigarettes; the creation of a new equity assessment fee to be paid by cigarette wholesalers; and the creation of the Early Childhood Health and Education Trust Fund, and the use of monies from the Fund for early childhood health and education programs. As long as voters are accurately and fairly advised of these key components of the initiative petition, the summary statement is fair and sufficient. We recognize that exempting Fund distributions from Article IX, § 8, and prohibiting the use of funds for research which otherwise complies with Article III, § 38(d), may be of interest to individual voters. But these details are not central to the initiative petition's purpose, and it is not necessary to reference them in the space of a summary statement limited to 100 words. We note that the initiative

21

petition contains other features which might also be of interest to particular voters. These include: the reformation of the Coordinating Board for Early Childhood into the Early Childhood Commission, which will administer the Fund; a prohibition on payments to any organization which provides abortion services; a prohibition on providing services or benefits funded by the initiative to persons who are not legal residents of the United States; and the "hold harmless" provision which seeks to compensate local governments and other funds for revenue reductions they experience as a result of reduced cigarette consumption. It would be impossible in the space of a 100-word summary to address all of these aspects of the initiative, even generally. The summary was not unfair and insufficient for its failure to reference the initiative's relationship to Article III, § 38(d), and Article IX, § 8.

We therefore affirm the trial court's conclusion that the summary statement's third bullet point was fair and sufficient.

**C.**

Section 116.190.4 provides that, "[i]nsofar as the action challenges the summary statement portion of the official ballot title, the court shall consider the petition, hear arguments, and in its decision certify the summary statement portion of the official ballot title to the secretary of state." Consistent with this directive and with its conclusion that the existing summary statement was not insufficient or unfair, the circuit court certified the existing language to the Secretary of State. Because we have found the language of the second bullet point to be insufficient and unfair, we reverse this aspect of the circuit court's judgment.

This Court has held in multiple cases that § 116.190.4 authorizes the circuit court to certify alternative language to the Secretary of State where the circuit court finds the existing summary statement language to be deficient. We have also held that, where this Court concludes that the summary statement is insufficient or unfair, we "step into the circuit court's shoes" by virtue of Supreme Court Rule

22

84.14.  Rule 84.14 authorizes appellate courts to "give such judgment as the court ought to give," and provides that, "[u]nless justice otherwise requires, the court shall dispose finally of the case."

We discussed these dispositional issues in *Seay v. Jones*, 439 S.W.3d 881, observing:

> We have repeatedly construed the provisions of § 116.190, and in particular the provisions of § 116.190.4, to authorize the courts to modify the language of a summary statement found to be insufficient or unfair, and to certify the modified language to the Secretary of State.  As we explained in *Cures without Cloning* [*v. Pund*], 259 S.W.3d 76 [(Mo. App. W.D. 2008)]:
>
>> Missouri courts have recognized that "Section 116.190 allows the trial court to correct any insufficient or unfair language of the ballot title and to certify the corrected official ballot title to the secretary of state."  These decisions are consistent with Section 116.190.3, which allows a petitioner in circuit court to request a "different summary statement" if the Secretary's ballot title is determined insufficient or unfair.  Notably, there is no provision for a remand of the summary statement under these circumstances.  Section 116.190.4 gives the court discretion to remand a fiscal note or fiscal note summary to the State Auditor to correct deficiencies, but the statute does not authorize remand of any portion of the ballot title to the Secretary for modification.  The statute implicitly allows the court to certify a corrected summary statement, and then "the secretary of state shall certify the language which the court certifies to [her]." Section 116.190.4.
>
> *Id.* at 83 (emphasis and other citations omitted); *see also*, *e.g.*, *Mo. Mun. League v. Carnahan*, 303 S.W.3d 573, 588-89 (Mo. App. W.D. 2010) (entering "a judgment modifying the ballot summary as set forth herein" and remanding modified language to Secretary of State); *Cole v. Carnahan*, 272 S.W.3d 392, 394-95 (Mo. App. W.D. 2008).

*Seay*, 439 S.W.3d at 894; *see also Protect Consumers' Access*, 2015 WL 7252587, at *4.

As we have explained above, in *Brown v. Carnahan* the Supreme Court approved the summary statement for a payday lending initiative which omitted

23

numerical values and may have been general, but which accurately advised voters of the effect which passage of the initiative would have. 370 S.W.3d at 664. With that decision in mind, we believe that adding the phrase "which fee shall increase annually" to the second bullet point will adequately advise voters that the equity assessment fee will be subject to mandatory annual increases, while modifying the Secretary of State's language in the most limited fashion possible. As modified, the second bullet point will read: "create a fee paid by cigarette wholesalers of 67 cents per pack of 20 on certain cigarettes, which fee shall increase annually."[8]

## II.

We now turn to the circuit court's conclusion that the State Auditor's fiscal note summary was unfair and insufficient.

The fiscal note summary states:

> When cigarette tax increases are fully implemented, estimated additional revenue to state government is $263 million to $374 million annually, with limited estimated implementation costs. The revenue will fund only programs and services allowed by the proposal. The fiscal impact to local governmental entities is unknown.

## A.

The trial court found the fiscal note summary deficient for two reasons. First, the court concluded that the Auditor acted unreasonably by including in the fiscal note summary the Department of Revenue's estimate of a $374 million increase in State revenues. The trial court held that the Auditor should have excluded the Department of Revenue's estimate because that estimate failed to account for the price elasticity of demand for cigarettes (in other words, because it

[8] At oral argument, counsel for Boeving and for the Secretary of State indicated that the initiative proponents have filed signed petitions with the Secretary of State pursuant to § 116.100, and that the Secretary of State's office is currently reviewing the signed petitions for sufficiency. We express no opinion concerning the effect of our decision today on the validity of the petitions which the initiative proponents have submitted to the Secretary of State.

24

failed to predict a decrease in cigarette consumption due to the increased taxes and fees). The trial court held that "[t]he failure to use even the most rudimentary concepts of Price and Demand render the inclusion of the unreasonably high DOR number deceptive and unfair." The trial court determined that "the Auditor should have identified [the use of zero price elasticity of demand] as an unreasonable assumption" and should therefore have excluded the Department of Revenue's revenue estimate from the fiscal note summary.

We initially note that the Department of Revenue's $374 million estimate is merely the upper bound of a range of potential effects on State revenue reported in the fiscal note summary. The lower bound is derived from the Office of Administration's estimate, which took account of price elasticity of demand in a manner with which Boeving has no dispute. Even if the Department of Revenue's estimate of the State revenue impact of the initiative were based on flawed assumptions, that estimate merely supplies the high end of the range of potential revenue impacts; it is not the sole estimate provided to voters.

More importantly, the circuit court's conclusion that the Auditor should have separately assessed, and rejected, the economic assumptions underlying the Department of Revenue's revenue estimate fundamentally misconceives the function of the State Auditor in preparing fiscal notes and fiscal note summaries. The Supreme Court described the Auditor's role in substantial detail in *Brown v. Carnahan*, 370 S.W.3d 637. It explained that, in preparing a fiscal note and fiscal note summary,

> [t]he auditor does not analyze or evaluate the correctness of the returned fiscal impact submissions. Rather, he or she examines the submissions to determine whether they appear complete, are relevant, have an identifiable source, and are reasonable. The auditor studies each submission regarding completeness, determining whether the entity's response conveys a complete representation of what the entity intended to send and if it reasonably is related to the proposal. He also reviews the submission to ensure there are no missing pages or breaks

25

in the continuity of information. With respect to reasonableness, the auditor examines the submission to establish whether it addresses or diverges from the particular issue. The auditor's determination of reasonableness is based on the auditor's experience in state government and overall knowledge and understanding of business and economic issues. If the auditor concludes a submission is unreasonable, he or she determines what weight the submission will be given when preparing the fiscal note summary. If the auditor has any questions regarding the submission of an entity or needs to clarify an incomplete submission, he or she may conduct a follow-up inquiry.

*Id.* at 649.

*Brown* also explained that the Auditor may rely on the fiscal submissions provided to him or her, without independently analyzing the reliability of those submissions:

The auditor is not required to compel and second-guess reasonable submissions from entities but is able to rely on the responses submitted. Nor should the auditor wade into the policy debates surrounding initiative petitions, which an independent investigation would entail. In each of these cases, proponents and opponents argued zealously for their position with respect to the initiative at issue. *It is not the auditor's role to choose a winner among these opposing viewpoints by independently researching the issue himself, double-checking economic theories and assumptions, and adopting one side's view over another's in the resulting fiscal note.*

*Id.* at 650 (emphasis added).

*Brown* applied these principles in connection with the fiscal note summary for the payday loan initiative that was at issue in one of the cases consolidated on appeal. In that case, the challengers argued that the Auditor had erroneously failed to consider the potential impact that limiting interest and fees could have on the economic viability of certain lenders (known as "510 lenders"). The Supreme Court disagreed:

The auditor did nothing out of his ordinary practice when incorporating verbatim the fiscal impact submissions that were returned to him, and the initiative opponents are unpersuasive in suggesting that the auditor should have undertaken additional examinations of the fiscal impacts that the initiative would have specifically on "510 lenders." While it might have been more informative to have had additional information related to the likely

26

fiscal impact of the initiative on "510 lenders," nothing required the auditor to look beyond the information he was provided in assessing the fiscal impact on those lenders. As noted earlier in this opinion: "The auditor is not required to compel and second-guess reasonable submissions from entities but is able to rely on the responses submitted . . . . [And][i]t is not the auditor's role to choose a winner . . . by independently researching the issue himself, double-checking economic theories and assumptions, and adopting one side's view over another's in the resulting fiscal note."

370 S.W.3d at 666-67.

We succinctly explained the scope of the Auditor's role in examining fiscal submissions he or she receives in *Protect Consumers' Access*:

> *The role of the Auditor is not to judge the merits of a fiscal impact submission*, but only to examine to determine whether the submission is complete, is relevant, has an identifiable source, and is reasonable.

2015 WL 7252587, at *6 (emphasis added). In *Protect Consumers' Access*, we rejected the argument of initiative proponents that the Auditor had an obligation to develop an estimate of the impacts of the initiative on State tax revenues.

> While the Auditor received general statements regarding potential impacts on the economy by the proponents of the Initiative, the Auditor received no submission that provided a projection of an increase or decrease of tax revenue to the State. Having received no submission regarding an impact on state finances for the Fiscal Note, it would be improper for the Auditor to include comment upon any impact to state finances in the summary. . . . As explained above, *it is not the Auditor's responsibility to undertake an independent investigation and comment upon a possible impact to state finances if no submissions are made to the Auditor describing those impacts.*

*Id.* at *7 (emphasis added); *see also Mo. Mun. League v. Carnahan*, 364 S.W.3d 548, 557 (Mo. App. W.D. 2011) (citing *Mo. Mun. League v. Carnahan*, 303 S.W.3d 573, 582 (Mo. App. W.D. 2010)).

The circuit court's conclusion that "the Auditor should have identified [the Department of Revenue's use of zero price elasticity of demand] as an unreasonable assumption" cannot be reconciled with the discussion of the Auditor's role in *Brown* and *Protect Consumers' Access*. The trial court's holding that the Auditor should have second-guessed, and rejected, the Department of Revenue's revenue estimate

27

"impose[s] on the Auditor a duty it does not have." *Id.* at *6. "Because the Department's submission addressed and did not diverge from the particular issue of the Initiative, it was reasonable." *Sinquefield v. Jones*, 435 S.W.3d 674, 682 (Mo. App. W.D. 2014) (citing *Brown*, 370 S.W.3d at 649).

Further, the Auditor had plausible grounds for concluding that the Department of Revenue's revenue estimate was not so speculative that it should be discounted or omitted entirely from the fiscal note summary. *See Sinquefield*, 435 S.W.3d at 685 (finding that Auditor was justified in finding a particular revenue estimate to be speculative, and therefore omitting it from the fiscal note summary). The employee from the Auditor's office who prepared the fiscal note and fiscal note summary testified that he determined that the Department of Revenue's failure to use a price-elasticity factor was "a reasonable assumption in this particular initiative petition," even though use of an elasticity factor might be appropriate if the new taxes and fees were higher. The representative also testified that he considered the fact that, "even with the $.60 to $1.27 increase in Missouri['s] cigarette tax, Misssouri['s] cigarette tax will remain lower than many of its contiguous states, in particular the states that border major metropolitan areas; Illinois and Kansas." The Auditor also noted that the Office of Administration (which had used a price elasticity factor to forecast a decrease in cigarette consumption following adoption of the initiative) stated in its fiscal submission that "*there is no way to truly know what impact these tax increases will have on demand* due to smoking cessation efforts, other state and federal regulations, and the increase in sales of e-cigarettes and other substitute products." (Emphasis added.) We see no reason to second guess the Auditor's conclusion that it was appropriate to reflect the Department of Revenue's estimate in the fiscal note summary; her decision to do so falls well within the scope of her authority.

28

Boeving argues that *Brown* is distinguishable because, in this case, the Auditor *chose* to conduct a more searching examination of the fiscal submissions than the review described in *Brown*. We disagree. Instead, we read the testimony as indicating merely that the official who prepared the fiscal note and fiscal note summary conducted the level of review required to determine the proper weight to give to the submissions (as *Brown* requires), and properly determined that the various submissions were not so speculative as to require that they be discounted. The Auditor's staff did not voluntarily assume an obligation to conduct a more searching review of the assumptions underlying the fiscal submissions.

We therefore conclude the trial court erred in its determination that the fiscal note summary was insufficient and unfair for including the Department of Revenue's estimate as the upper bound of a range of potential increases to State revenue as a result of the initiative petition.

**B.**

The circuit court also held that the fiscal note summary's statement that local fiscal impact was "unknown" was problematic, because of submissions identifying the range of impact as between $0 and a loss of $10.4 million. Again, we disagree.

Boeving's argument misreads the Office of Administration's fiscal submission, which he contends estimates a $10.4 million reduction in local sales taxes. Although the Office of Administration's submission predicts that local sales taxes will be reduced by $10.4 million as a result of the initiative, that estimate does not take into account the effect of the initiative's "hold harmless" provision. As the Office of Administration's submission recognized, the "hold harmless" provision allows up to 4 percent of the money collected under the initiative to be distributed to political subdivisions experiencing revenue declines, so long as the Departments of Revenue and Health and Senior Services determine that the initiative "directly caused" those declines.

29

Although the Office of Administration's fiscal submission does not take a definite position as to whether the "hold harmless" provision would be triggered, its submission assumes that the $10.4 million revenue decline was caused by the increased taxes and fees imposed by the initiative. Thus, although other agencies would make the causation determination necessary to actually trigger the "hold harmless" provision, the Office of Administration plainly assumed that the facts would justify a determination that the revenue declines it predicted were, in fact, "directly caused" by the initiative. In these circumstances, it was reasonable for the Auditor to assume that the hold harmless provision would be triggered, and would compensate localities fully for any declines in sales taxes which the Office of Administration forecast. *See Protect Consumers' Access*, 2015 WL 7252587, at \*5 (concluding that Auditor reasonably interpreted fiscal submission to represent potential financial impacts on "the University of Missouri system as a whole," and as representing a "one-time cost").

The Auditor nevertheless chose to indicate that the impact on local governmental entities would be "unknown" because of the potential for reduced local healthcare costs due to reductions in smoking, the potential that local entities would benefit from increased funding of childhood education, and the potential that localities might be able to compete for grants funded by the initiative. Although Boeving argues that "'unknown' cannot be a sufficient description of fiscal impact when the Auditor had reasonable submissions quantifying the fiscal impact," the Auditor reasonably concluded that the Office of Administration's submission did not, in fact, "quantify" an expected decrease in local sales tax revenues, because of the availability of "hold harmless" payments. In the circumstances of this case, "[t]he use of the word "unknown" . . . adequately fulfills the fiscal note summary's purpose of informing the public about the proposed initiative's potential fiscal consequences without using language that is likely to cause bias, prejudice,

30

deception, or favoritism for or against the proposal." *Sinquefield*, 435 S.W.3d at 685. Here, as in *Sinquefield*, "[t]he majority of submissions indicated that there would be either no impact or no direct, foreseeable, or adverse impact, or in some way indicated they at least did not anticipate such impact." *Id.* The "[u]se of the word 'unknown' in the fiscal note summary to characterize potential impact to revenues for state and local governments is sufficient and fair." *Id.* Further, "courts must remain mindful that the word limitations of the fiscal note summary necessarily result in exclusion of specific fiscal impact details that might improve the summary but that are not required for it to be upheld as sufficient and fair." *Brown v. Carnahan*, 370 S.W.3d at 667; *see also Sinquefield*, 435 S.W.3d at 683.

## Conclusion

The judgment of the circuit court is reversed. We conclude that the fiscal note summary prepared by the State Auditor is fair and sufficient, and the trial court erred by vacating it, and remanding it to the State Auditor. We also find that the summary statement prepared by the Secretary of State is unfair and insufficient, and we hereby certify the following summary statement language to the Secretary of State, for inclusion in the official ballot title for the initiative petition:

Shall the Missouri Constitution be amended to:

- increase taxes on cigarettes each year through 2020, at which point this additional tax will total 60 cents per pack of 20;

- create a fee paid by cigarette wholesalers of 67 cents per pack of 20 on certain cigarettes, which fee shall increase annually; and

- deposit funds generated by these taxes and fees into a newly established Early Childhood Health and Education Trust Fund?

_____
Alok Ahuja, Judge

All concur.

31