Corrected Opinion
November 3, 2023



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| HANNAH SUE KELLY, KATHLEEN ANNE FORCK, and MARY ELIZABETH ANNE COLEMAN, <br><br> Appellants, <br><br> v. <br><br> SCOTT FITZPATRICK, MISSOURI STATE AUDITOR, in his official capacity, JOHN R. ASHCROFT, MISSOURI SECRETARY OF STATE, in his official capacity, and ANNA FITZ-JAMES, <br><br> Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> WD86594 <br><br> Filed: October 31, 2023 |

**Appeal from the Circuit Court of Cole County**
**The Honorable Jon E. Beetem, Judge**

**Before Special Division: Alok Ahuja, P.J., and**
**Karen King Mitchell and Mark D. Pfeiffer, JJ.**

Dr. Anna Fitz-James submitted six proposed initiative petitions to the Missouri Secretary of State. Although worded differently, each of the six initiatives would amend the Missouri Constitution to prohibit the government from denying or infringing "a person's fundamental right to reproductive freedom." Missouri State Auditor Scott Fitzpatrick prepared fiscal notes and fiscal note summaries to estimate the costs or savings to state and local

government entities if the initiatives were adopted. Hannah Sue Kelly, Kathleen Anne Forck, and Mary Elizabeth Anne Coleman (collectively, "Kelly") filed suit in the Circuit Court of Cole County, challenging the sufficiency and fairness of the Auditor's fiscal notes and fiscal note summaries. Following a bench trial on stipulated facts, the circuit court found the Auditor's fiscal notes and fiscal note summaries to be fair and sufficient. Kelly appeals. We affirm.

## Factual Background

Dr. Fitz-James submitted six proposed initiative petitions to the Secretary of State in March 2023. Each petition proposes to add a new § 36 to Article I of the Missouri Constitution, to be known as "The Right to Reproductive Freedom Initiative." Section 2 of each petition provides:

> The Government shall not deny or infringe upon a person's fundamental right to reproductive freedom, which is the right to make and carry out decisions about all matters relating to reproductive health care, including but not limited to prenatal care, childbirth, postpartum care, birth control, abortion care, miscarriage care, and respectful birthing conditions.

In § 3, each petition provides that "[t]he right to reproductive freedom shall not be denied, interfered with, delayed, or otherwise restricted unless the Government demonstrates that such action is justified by a compelling governmental interest achieved by the least restrictive means." A governmental interest will only be considered "compelling" if it has the purpose and effect "of improving or maintaining the health of a person seeking care, is consistent with widely accepted clinical standards of practice and evidence-based medicine, and does not infringe on that person's autonomous decision-making." The petitions each prohibit discrimination against, or punishment or prosecution of, any

2

person for exercising their right to reproductive freedom, or for assisting another person in exercising that right.

Although the core provisions of each petition are similar, they vary in significant respects. Some of Dr. Fitz-James' proposed initiative petitions do not expressly address governmental regulation of abortions. Certain proposed petitions expressly permit abortion regulation after a fetus has reached twenty-four weeks' gestational age, while other versions permit governmental regulation after fetal viability (in both cases, with exceptions where an abortion is necessary to protect the life or health of the mother, or involves a nonviable fetus). Certain of the petitions would expressly permit the legislature to enact laws requiring parental consent before a minor can obtain an abortion (with stated exceptions to the consent requirement). Finally, certain versions of the petitions explicitly provide that "[n]othing in this Section requires government funding of abortion procedures."

The terms of Dr. Fitz-James' petitions are described in greater detail in our opinion in *Fitz-James v. Ashcroft*, No. WD86595, which is also being handed down today; the full text of each petition is included in an appendix to that opinion.

The Missouri Supreme Court's opinion in *State ex rel. Fitz-James v. Bailey*, 670 S.W.3d 1 (Mo. 2023), describes the process by which fiscal notes and fiscal note summaries were prepared for Dr. Fitz-James' petitions:

> The Secretary [of State] posted the text of the initiatives on his website, as he was required to do by section 116.332,[1] and sent a

---

[1] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2023 Cumulative Supplement.

copy of each proposed petition to the Attorney General and the Auditor. . . .

Upon receiving the proposed petitions from the Secretary, the Auditor solicited input from 60 state and local governmental entities regarding estimated costs or savings, if any, of each proposed initiative. § 116.175.1.[2] In addition to these solicited submissions, the Auditor accepted and recorded unsolicited responses received from any other governmental entity, proponents, opponents, and members of the public.

> [2] The Auditor solicited input from the Attorney General's Office; the Governor's office; the Missouri Senate; the Missouri House of Representatives; the Secretary of State's office; the Office of the State Public Defender; the State Treasurer's Office; the Office of Administration; the Office of State Courts Administrator; 16 different departments of state government; 12 counties; 14 cities; five school districts; and four colleges and universities.

The Department of Social Services, Department of Mental Health, and Department of Health and Senior Services indicated they anticipated no fiscal impact, other than unknown impact related to federal regulations. No other state department, nor the Attorney General, provided a response indicating any of the initiatives would jeopardize the state's federal Medicaid funding. The only county to report an anticipated fiscal impact was Greene County, which estimated a $51,000 fiscal loss. All other responsive counties reported no anticipated fiscal impact. Opponents of the initiatives indicated they believed the initiatives could risk the state's federal Medicaid funding and result in reduced tax revenues. The Auditor received no submission of estimated fiscal impact from proponents of the initiatives.

The Auditor then created a fiscal note, which recorded the responses received, and a fiscal note summary for each of the proposed petitions[3] and, on March 29, sent these documents to the Attorney General as required by section 116.175.2.

> [3] The fiscal notes vary slightly due to differences in the proposed petitions, but the fiscal note summaries produced for each proposed initiative are identical.

*State ex rel. Fitz-James*, 670 S.W.3d at 4-5.

The Auditor prepared the identical fiscal note summary for each initiative petition, which states:

> State governmental entities estimate no costs or savings, but unknown impact. Local governmental entities estimate costs of at least $51,000 annually in reduced tax revenues. Opponents estimate a potentially significant loss to state revenue.

Because the fiscal note summaries are identical for each of Dr. Fitz-James' proposed initiatives, and because the differences in the fiscal notes themselves do not affect our analysis, we refer to a single "fiscal note" and "fiscal note summary" in the remainder of this opinion.

The Attorney General notified the Auditor on April 10, 2023, that the Attorney General believed the "legal content" of the fiscal note and summary were deficient, because (in the Attorney General's view),

> they: (1) did not accurately represent the true cost of the proposed measures to local and state government entities (because the fiscal notes did not do so), and (2) failed to adequately summarize the submissions the Auditor received regarding the potential loss of federal funding due to the proposed initiatives.

*State ex rel. Fitz-James*, 670 S.W.3d at 5.

Because he believed that the Attorney General lacked statutory authority to question the substantive correctness of the fiscal note and summary, the Auditor resubmitted his original fiscal note and summary to the Attorney General on April 21. On May 1, 2023, the Attorney General refused to approve the fiscal note and summary. The Attorney General's refusal to approve the fiscal note and summary prevented the Secretary of State from certifying the official ballot title

for any of the initiative petitions under § 116.180, and prevented Dr. Fitz-James from soliciting valid signatures supporting the petitions under § 116.334.2.

"To break this impasse, Fitz-James filed a petition in the Cole County circuit court on May 4 seeking a writ of mandamus to compel the Attorney General to perform his duty under section 116.175.4 . . . ." *State ex rel. Fitz-James*, 670 S.W.3d at 6. The circuit court issued a writ of mandamus directing the Attorney General to approve the Auditor's fiscal note and summary. The Supreme Court affirmed. It explained:

> The Attorney General challenges . . . the ***substance*** of the fiscal notes, i.e., the assessment of the proposal's cost or savings, if any, to state or local governmental entities. But section 116.175.1 makes clear that the substantive responsibility for assessing the fiscal impact of a measure belongs solely to the Auditor, and only the "legal content and form" of that assessment are to be reviewed by the Attorney General [pursuant to § 116.175.3].

*Id.* at 8-9. The Supreme Court ordered the Attorney General "forthwith to comply" with the writ of mandamus issued by the circuit court. *Id.* at 13 n.10.

The Supreme Court issued its opinion in *State ex rel. Fitz-James* on July 20, 2023. On the same day, the Attorney General issued new opinion letters approving the legal content of the Auditor's fiscal note and fiscal note summary under § 116.175.4. On July 26, 2023, the Secretary of State certified ballot titles for each of Dr. Fitz-James' initiative petitions, which included the fiscal note and fiscal note summary prepared by the Auditor.

Kelly filed her petition challenging the fiscal note and fiscal note summary in the Circuit Court of Cole County on August 7, 2023. As required by § 116.190.2, the petition named both Auditor Scott Fitzpatrick, and Secretary of

State John Ashcroft, as defendants. Dr. Fitz-James was granted leave to intervene as a defendant.

The case was submitted to the circuit court for resolution on a stipulated set of facts and exhibits on September 11, 2023. The case was heard simultaneously with a separate series of cases challenging the Secretary of State's summary statements for Dr. Fitz-James' petitions; the appeal of the summary-statement cases is decided in our opinion in *Fitz-James v. Ashcroft*, No. WD86595.

In a proposed judgment submitted to the court on September 18, Kelly proposed that the fiscal note summary be amended to read:

> Local governmental entities estimate costs due to reduced tax revenues, which across the state could be estimated to cost millions of dollars annually. In addition, revenue losses to the State and additional health care costs to the State are unknown but could be billions of dollars annually.

The circuit court entered its judgment rejecting Kelly's claims on September 25, 2023. Kelly filed her notice of appeal on September 26, 2023, the day after entry of the circuit court's judgment. We adopted an expedited schedule for briefing and argument on September 28.

On October 6, Kelly filed in both the Missouri Supreme Court and in this Court applications to transfer the appeal to the Missouri Supreme Court prior to disposition. We denied the application filed here on October 12, 2023. We noted that, under Rule 83.01, only the Supreme Court has discretionary authority to transfer an appeal to that Court prior to disposition. We also explained that, "contrary to Appellants' suggestion that this case implicates the Supreme Court's exclusive appellate jurisdiction, this Court has frequently considered challenges

7

to ballot titles, where the underlying initiative petitions, if adopted, might have the effect of rendering existing statutes unconstitutional." (Citing as examples *Sweeney v. Ashcroft*, 652 S.W.3d 711 (Mo. App. W.D. 2022); *Sedey v. Ashcroft*, 594 S.W.3d 256 (Mo. App. W.D. 2020); and *Ritter v. Ashcroft*, 561 S.W.3d 74 (Mo. App. W.D. 2018)). The Supreme Court denied the transfer application filed in that Court on October 17, 2023. No. SC100275.

### Discussion

To repeat, the Auditor's fiscal note summary for Dr. Fitz-James's six initiative petitions states:

> State governmental entities estimate no costs or savings, but unknown impact. Local governmental entities estimate costs of at least $51,000 annually in reduced tax revenues. Opponents estimate a potentially significant loss to state revenue.

Kelly challenges each sentence of the summary, on multiple grounds.

We begin by reviewing the Auditor's general authority to create fiscal note summaries for proposed initiatives. A summary of every initiative petition, called the "official ballot title," appears both on the petition when it is circulated for signature, and on the ballot if the measure is certified for submission to the electorate. *See* §§ 116.180, 116.230. The official ballot title has two components: a "summary statement" prepared by the Secretary of State, which must not exceed one hundred words and "shall be in the form of a question using language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure," § 116.334.1; and a "fiscal note summary" prepared by the Auditor, which is limited to fifty words, and which "shall state the measure's estimated cost or savings, if any, to state or local governmental

8

entities . . . in language neither argumentative nor likely to create prejudice either for or against the proposed measure." § 116.175.3.

In *Brown v. Carnahan*, 370 S.W.3d 637 (Mo. 2012), the Supreme Court comprehensively described the Auditor's role in preparing a fiscal note and fiscal note summary. Because it remains authoritative, we set out *Brown*'s description of the Auditor's role at length:

> Section 116.175.1 states the auditor "shall assess the fiscal impact of the proposed measure" and "may consult with the state departments, local government entities, the general assembly and others with knowledge pertinent to the cost of the proposal." Proponents and opponents of any proposed measure are permitted to submit their own fiscal impact statement to the auditor. *Id.* Section 116.175.2 directs the auditor to prepare the fiscal note and fiscal note summary within 20 days of receipt of the petition sample sheet. . . .
>
>     . . . .
>
>     . . . In preparing the fiscal note, the auditor sends copies of the proposed ballot initiative to various state and local governmental entities requesting the entities review the same and provide information regarding the estimated costs or savings, if any, for the proposed ballot initiative. *See* sec. 116.175.1 (stating that the auditor "may consult with the state departments, local government entities, the general assembly and others with knowledge pertinent to the cost of the proposal"). The auditor chooses local governmental entities based on geography, population, and form of government to ensure a good cross-section of local governments that might be affected by the proposal are represented. Proponents, opponents, and members of the public may submit fiscal impact submissions also; however, the auditor has no duty to notify members of the public when he receives an initiative petition from the secretary of state.
>
>     The auditor does not analyze or evaluate the correctness of the returned fiscal impact submissions. Rather, he or she examines the submissions to determine whether they appear complete, are relevant, have an identifiable source, and are reasonable. The

9

auditor studies each submission regarding completeness, determining whether the entity's response conveys a complete representation of what the entity intended to send and if it reasonably is related to the proposal. He also reviews the submission to ensure there are no missing pages or breaks in the continuity of information. With respect to reasonableness, the auditor examines the submission to establish whether it addresses or diverges from the particular issue. The auditor's determination of reasonableness is based on the auditor's experience in state government and overall knowledge and understanding of business and economic issues. If the auditor concludes a submission is unreasonable, he or she determines what weight the submission will be given when preparing the fiscal note summary. If the auditor has any questions regarding the submission of an entity or needs to clarify an incomplete submission, he or she may conduct a follow-up inquiry.

The auditor then drafts the fiscal note and fiscal note summary based solely on the responses he or she receives. The responses submitted are listed verbatim in the fiscal note with only minor editing. The fiscal note summary is a compilation of the various proposals and is intended to advise the voters about the potential cost or savings, if any, from the adoption of the initiative.

370 S.W.3d at 648, 649 (footnotes omitted); *see also*, *e.g.*, *Sinquefield v. Jones*, 435 S.W.3d 674, 677 (Mo. App. W.D. 2014).

Although the Auditor is required to solicit, review, evaluate, compile, and then summarize the reliable fiscal submissions he receives, *Brown* makes clear that the Auditor is not required to conduct an independent investigation of the financial impacts of a proposal:

The auditor is not required to compel and second-guess reasonable submissions from entities but is able to rely on the responses submitted. Nor should the auditor wade into the policy debates surrounding initiative petitions, which an independent investigation would entail. In each of these cases, proponents and opponents argued zealously for their position with respect to the initiative at issue. It is not the auditor's role to choose a winner among these

10

opposing viewpoints by independently researching the issue himself, double-checking economic theories and assumptions, and adopting one side's view over another's in the resulting fiscal note.

370 S.W.3d at 650.

As the Supreme Court only recently re-emphasized, "section 116.175 vests great discretion in the Auditor, both as to what information to solicit as well as whether and to what extent to rely on whatever information is received." *State ex rel. Fitz-James*, 670 S.W.3d at 9 n.6 (citing *Brown*, 370 S.W.3d at 667).

Any Missouri citizen may file a challenge in the Circuit Court of Cole County, within ten days of the Secretary of State's certification of the official ballot title, to challenge the fiscal note or fiscal note summary on the grounds that they are "insufficient or unfair." § 116.190.3.

> In the context of requiring a fair and sufficient fiscal note by the state auditor, "the words insufficient and unfair . . . mean to inadequately and with bias, prejudice, deception and/or favoritism state the fiscal consequences of the proposed proposition." Similarly, in examining the fairness and sufficiency of the fiscal note summary, the summary's words are considered sufficient and fair where they adequately and without bias, prejudice, or favoritism synopsize the fiscal note. "[A] fiscal note summary is not judged on whether it is the 'best' language, only [on] whether it is fair."

*Brown*, 370 S.W.3d at 654 (citations omitted).

> *De novo* review of the trial court's legal conclusions about the propriety of . . . the auditor's fiscal note and fiscal note summary is the appropriate standard of review when there is no underlying factual dispute that would require deference to the trial court's factual findings.

*Id.* at 653 (citation omitted).

## I.

Kelly's first Point challenges the first sentence of the fiscal note summary, which states that "State governmental entities estimate no costs or savings, but unknown impact."

## A.

Kelly first complains that the first sentence of the fiscal note summary fails to reflect the risk to the State of a loss of federal Medicaid funding.

As an initial matter, we note that the submissions of non-governmental opponents of the initiatives, which predicted substantial reductions to the State's Medicaid funding, *are* reproduced verbatim in the Auditor's fiscal note. Moreover, the concerns over Medicaid funding expressed by those non-governmental commenters are reflected, at least generally, in the third sentence of the fiscal note summary, which states that "[o]pponents estimate a potentially significant loss to state revenue."

In attacking the *first* sentence of the summary, which describes fiscal submissions received *from State agencies*, Kelly relies on submissions by the Governor's Office, and by the Attorney General, *after* the fiscal note and fiscal note summary were prepared. As reflected in the Auditor's fiscal note, the Governor's Office initial response "indicated th[ese] proposal[s] relating to reproductive issues do[ ] not financially impact their office." Similarly, the Attorney General's Office initially responded that, "to the extent that enactment of th[ese] proposal[s] would result in increased litigation, their office could absorb the costs associated with the increased litigation using existing resources" (although the Attorney General advised that, if the proposals resulted in *substantial* additional litigation, he may need to request additional

12

appropriations). Thus, the responses submitted by the Governor and Attorney General before the Auditor's preparation of the fiscal note and fiscal note summary made no mention of potential reductions to Missouri's federal Medicaid funding; moreover, no timely submission from any other State agency expressed concerns over Medicaid funding.

On March 29, 2023, the Auditor submitted his fiscal note and fiscal note summary to the Attorney General for the legal review required by § 116.175.4. Following the Auditor's submission of the fiscal note and summary, the Governor's Office submitted a supplemental fiscal statement on April 7, 2023. In the April 7 letter, the Governor's Office for the first time expressed concern that Dr. Fitz-James' proposals may lead to litigation costs based on "requirements of parental consent," and purported conflicts with *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). The Governor's Office also stated that "this petition appears to conflict with the federal policy related to the Hyde Amendment and expending public funds on abortions," which could violate "federal requirements related to Medicaid and MO HealthNet," potentially "lead[ing] to a fiscal impact of up to $600M." The Governor's Office's belated, seven-sentence supplemental response provided no further information concerning the litigation it feared, or the specific manner in which it believed Dr. Fitz-James' proposals would cause conflicts with federal law, and endanger the State's Medicaid funding.

On April 10, 2023, the Attorney General issued Opinion Letter No. 207-2023, which repeated many of the objections to the fiscal note and summary which Kelly renews in this litigation, including a concern that adoption of any of

Dr. Fitz-James' proposed initiatives would endanger the State's Medicaid funding.

Because the Governor's and Attorney General's April 7 and April 10 responses were untimely, the Auditor was not able to address them in the fiscal note or fiscal note summary. The General Assembly has mandated that fiscal notes and fiscal note summaries be prepared on an extremely compressed timeline (although the processing of Dr. Fitz-James' petitions has taken substantially longer). Upon receipt of a proposed initiative petition to amend the Constitution, "[t]he secretary of state shall refer a copy of the petition sheet . . . to the state auditor for purposes of preparing a fiscal note and fiscal note summary." § 116.332.1. The Auditor must receive all fiscal submissions within ten days of the Auditor's receipt of the proposed initiative from the Secretary of State. § 116.175.1. The Auditor must prepare the fiscal note and summary within twenty days after receiving the petition sample sheet from the Secretary of State, and must forward the fiscal note and summary to the Attorney General. § 116.175.2. The Attorney General then has ten days in which to approve the "legal content and form" of the fiscal note summary, and provide notice of approval to the Auditor. § 116.175.4. Within three days of receiving the official summary statement, and the approval of the fiscal note summary and fiscal note, the Secretary of State must certify the official ballot title. § 116.180. Challengers then have ten days within which to challenge the ballot title. § 116.190.1.

Given this compressed, carefully orchestrated timeline, the Auditor need not consider fiscal submissions which are untimely – particularly if those submissions are received *after* the fiscal note and summary have been prepared

14

and submitted to the Attorney General for review.  *Protect Consumers' Access to Quality Home Care Coal., LLC v. Kander*, 488 S.W.3d 665, 676 (Mo. App. W.D. 2015) (fiscal note summary need not refer to analysis which "was not timely provided to the Auditor for inclusion in the Fiscal Note"); *see Brown*, 370 S.W.3d at 649 n.9 (noting that, "[a]lthough section 116.175 imposes a 10-day deadline for submissions, the current auditor's practice is to consider information received beyond the deadline if there is time available to analyze the submission").  The fact that the Auditor's fiscal note and fiscal note summary do not reflect correspondence he received *after* the note and summary were prepared is hardly surprising, and is no basis for this Court to refuse to certify the fiscal note or summary.

In any event, the Auditor did not abuse his "great discretion"[2] by choosing to discount concerns expressed by the Governor's Office and Attorney General over the potential loss of Medicaid funding.  The Auditor explained in detail his evaluation of the claims of reduced Medicaid funding.  In responding to the Attorney General's April 10, 2023 Opinion Letter, the Auditor explained:

> The entity tasked with managing the state's Medicaid program, the Department of Social Services (DSS), as well as the Department of Mental Health (DMH), and the Department of Health and Senior Services (DHSS) (the other agencies with exposure to the Medicaid program) indicated they do not anticipate a fiscal impact, other than an unknown impact related to regulating abortion facilities submitted by DHSS, as a result of [Dr. Fitz-James' petitions] and no other state agency, nor the Attorney General's Office, provided a response that indicated [the petitions] would jeopardize federal Medicaid funding.  Your opinion states that you disagree with the fiscal response of DSS and the Department of

---

[2]     *State ex rel. Fitz-James*, 670 S.W.3d at 9 n.6.

Revenue (DOR), stating their submissions are missing the inclusion of the potential loss of Medicaid funding and tax revenue respectively, and assert another submission should be requested. . . .

. . . The responses received from DSS and DOR were clear and did not raise additional questions or appear incomplete. Even so, since receiving your opinion, I have spoken with the Director of the Department of Social Services and the Director of MO Healthnet, as well as the Director of the Department of Revenue regarding [Dr. Fitz-James' petitions] and have been informed that after consideration of the contents of your opinion relevant to their agencies, neither DSS nor DOR will be modifying their response.

. . . Based on my experience in state government as a legislator, State Treasurer, and State Auditor and my overall knowledge and understanding of the state budget and Medicaid funding, I see no argument to be made that the state's $12.5 billion in annual Medicaid funding is at risk. Additionally, no legal opinion presented to me, including yours, provides analysis supporting the claim that Missouri's Medicaid funding could be lost due to mandated violations of federal law, and stating such in the fiscal note summary would be inaccurate. While I personally find the content of the [petitions] extremely morally objectionable, that is not a sufficient reason for me to claim the state could lose $12.5 billion of federal funds annually.

(Footnote omitted.)

Kelly's opening Brief fails to present this Court with any properly supported legal argument which would permit us to conclude that the Auditor had abused his discretion in discounting the concerns over endangerment of Medicaid funding. In her opening Brief, Kelly contends that, if any of Dr. Fitz-James' initiative petitions are adopted, the petitions are "likely to be interpreted to deny governmental entities and others acting on behalf of the State, including Medicaid providers, the right to refuse to provide 'reproductive' health procedures and treatments." App Br. 26. According to Kelly, this "likely . . . interpret[ation]" of the petitions will force providers to "provide 'reproductive'

health treatments that violate their religious beliefs or be cut off from Medicaid reimbursement," App Br. 26-27, which will result in the State violating "federal Medicaid reimbursement policies, which prohibit public funding of abortions and protect conscience rights." App. Br. 30 (footnote omitted).

While Kelly makes these broad claims, the argument under Point I of her opening Brief cites _no_ legal authority – no caselaw, no statutes, no regulations – which would support the contention that adoption of any of the initiative petitions would result in violations of federal Medicaid rules, and thereby endanger the State's Medicaid funding.

> "An appellant must cite legal authority to support his points relied on if the point is one in which precedent is appropriate or available; if no authority is available, an explanation should be made for the absence of citations." "Failure to cite relevant authority supporting the point or to explain the failure to do so preserves nothing for review."

*E.K.H.-G. v. R.C.*, 613 S.W.3d 449, 453 (Mo. App. E.D. 2020) (quoting *In re Marriage of Fritz*, 243 S.W.3d 484, 488 (Mo. App. E.D. 2007)); *see also*, *e.g.*, *Walker v. Div. of Emp't Security*, 592 S.W.3d 384, 390 (Mo. App. W.D. 2020). We cannot conclude that the Auditor incorrectly discounted the claims that adoption of the initiatives would threaten the State's Medicaid funding, when Kelly fails to present us with a properly supported legal argument establishing error.

Kelly's Brief cites to enforcement actions taken by the federal government against the California and Vermont Medicaid programs, based on claims that those States had violated federal law in implementing the States' abortion policies. As the Auditor explains, however, the federal government ultimately

discontinued those enforcement actions, and no disallowance of federal Medicaid funding ever actually occurred. Moreover, the situations in California and Vermont are plainly distinguishable. The enforcement action against California was triggered by a universal statewide mandate that all health insurers cover abortion-related care, which Dr. Fitz-James' initiative petitions do not require. Vermont was alleged to have violated the "Church Amendment," 42 U.S.C. § 300a-7(c)(1), which prohibits recipients of federal funds from discriminating against persons who refuse to assist in the performance of abortions "contrary to [the individual's] religious beliefs or moral convictions." Once again, nothing in the initiative petitions explicitly imposes an obligation on particular health-care facilities or practitioners to participate in abortion-related care, and even if the petitions contained such a provision, Kelly does not address how that state-law provision would not be preempted by the Church Amendment. *See* U.S. CONST. art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.")

Kelly's Brief also refers to a fiscal note and summary prepared by a predecessor of Auditor Fitzpatrick in 2019. The 2019 fiscal note addressed the financial consequences of a proposed referendum. The proposed referendum would have submitted to voters for their approval H.B. 126, which had been adopted by the General Assembly in 2019, and which banned most abortions. *See* H.B. 126, 100th Gen. Assembly, 1st Reg. Sess., 2019 MO. LAWS 272. The referendum was never certified to appear on the ballot, and the amendments

18

made by H.B. 126 accordingly became law, and are codified in various provisions of Chapter 188, RSMo.  *See generally Stickler v. Ashcroft*, 539 S.W.3d 702, 712-13 (Mo. App. W.D. 2017) (describing referendum process).

Kelly's reliance on the 2019 fiscal note and summary cannot establish that Auditor Fitzpatrick abused his discretion in the fiscal note and fiscal note summary which are under review here.  As the circuit court aptly observed:

> Petitioners' argument is interesting, because in essence they are saying the fiscal note summary for [H.B. 126] correctly advised voters that *banning* abortion places federal Medicaid dollars at risk.  Petitioners simultaneously argue the provisions of the eleven initiatives, which seek to *legalize* abortion, place federal Medicaid dollars at risk.  Petitioners have thus argued that both banning *and* legalizing abortion would each result in a 100% disallowance of the state's federal Medicaid funding.  That argument is untenable, and the record tends to show neither scenario has resulted in a disallowance of federal Medicaid funding, in any amount.  Prior to HB 126 becoming law (when abortion was legal in Missouri) the state was not being penalized by [the U.S. Department of Health and Human Services], nor has it been penalized after 2022 when HB 126 became effective (and now abortion is only legal in a medical emergency).

Given the directly opposite intended effects of H.B. 126 and of Dr. Fitz-James' petitions, the fiscal note and summary for H.B. 126 provides little if any guidance concerning the potential fiscal impact of the present petitions.  Moreover, given the "great discretion in the Auditor . . . whether and to what extent to rely on whatever information is received," *State ex rel. Fitz-James*, 670 S.W.3d at 9 n.6, the actions of a prior Auditor, addressing a proposed referendum having the opposite effect to the current petitions, provides no basis to find that Auditor Fitzpatrick's current fiscal note and summary are insufficient or unfair.

Kelly's Brief also contends that the Auditor acted inconsistently by engaging in searching scrutiny of the claims concerning the State's Medicaid funding, while not applying the same skepticism to Greene County's estimate of the tax revenue reductions it would experience, or to opponents' predictions that the initiatives would have wide-ranging, negative economic impacts to the State. We perceive no inconsistency. As we discuss in §§ II and III below, the economic consequences of expanded individual reproductive freedoms on the larger community, and on the State-wide economy, may be difficult to gauge, and may be subject to considerable debate. In that context, the Auditor was entitled to exercise his discretion to include in the fiscal note and summary the estimates prepared by commenters concerning the potential financial consequences of the initiatives. *Brown*, 370 S.W.3d at 650 ("the auditor [should not] wade into the policy debates surrounding initiative petitions"; "[i]t is not the auditor's role to choose a winner among . . . opposing viewpoints" concerning the effects of a proposed initiative). The potential effect of adoption of the initiatives on the State's eligibility for federal Medicaid funding, by contrast, presented a more specific and narrow question. On that issue, the Auditor had advice from the responsible agencies supporting his decision to discount the belated concerns expressed by the Governor's Office and the Attorney General.

Given the untimeliness of the Governor's and Attorney General's submissions suggesting threats to the State's Medicaid funding, the disclaimers of such a risk by multiple agencies charged with implementing Missouri's Medicaid program, and Kelly's failure to substantiate her claim that passage of any of the initiative petitions would in fact put federal Medicaid funding at risk, the Auditor

20

acted well within his discretion in failing to include any claimed risk to Medicaid funding in the first sentence of the fiscal note summary. *See Protect Consumers' Access*, 488 S.W.3d at 676 (fiscal note summary need not refer to potential effects on State revenue where "[t]he analysis provided by Plaintiffs . . . is mere conjecture"); *Sinquefield v. Jones*, 435 S.W.3d 674, 685 (Mo. App. W.D. 2014) (Auditor may omit a particular submission from fiscal note summary, where Auditor finds it to be speculative).

**B.**

Kelly also claims that the first sentence of the fiscal note summary is unfair and insufficient for referring to an "unknown impact" on State entities. To the contrary, Kelly claims that the financial impacts on State entities are significant, and certain.

Other than the claimed risk to federal Medicaid funding which we have addressed above in § I.A, the only other possible impact reflected in State agencies' fiscal submissions came from the Department of Health and Senior Services, which explained:

> The amendment limits the state government's authority to restrict reproductive health, including abortion care. The impact on the Department of Health and Senior Services will largely depend on the court's interpretation of the constitutional language and the extent the court determines that licensing and regulation of abortion facilities is overly restrictive to reproductive freedom. The court's interpretation has the potential to:
>
> • Void all or most of the current statutes outlined in Chapter 188 that regulate abortion;
>
> • Remove the Department's authority to license abortion facilities;
>
> • Remove the Department's authority to regulate abortion facilities;

- Negate promulgated rules surrounding abortion; and/or

- Expand the practice of abortion and number of abortion facilities in Missouri; however, by how far is unpredictable.

The General Assembly will have the ability to enact laws that regulate abortion; however, there will be restrictions based on the amendment, as well as the court's interpretation of the restrictive nature of licensure and regulation.

Due to the various factors stated above, the proposed constitutional amendment has an unknown impact on the Department.

The Department of Health and Senior Services stated that it was unable to determine how the petitions might impact the Department's regulation of abortion facilities and abortion providers, and the costs of those regulatory activities, because the effect of the petitions on the Department's regulatory program would depend on future judicial interpretations, and future legislative action. In the face of such uncertainties,

"[t]he use of the word 'unknown' . . . adequately fulfills the fiscal note summary's purpose of informing the public about the proposed initiative's potential fiscal consequences without using language that is likely to cause bias, prejudice, deception, or favoritism for or against the proposal."

*Boeving v. Kander*, 493 S.W.3d 865, 887 (Mo. App. W.D. 2016) (quoting *Sinquefield*, 435 S.W.3d at 685).

Kelly also complains that the first sentence of the fiscal note summary is internally inconsistent, because it says _both_ that "State governmental entities estimate no costs or savings," but also that State agencies believe the petitions will have an "unknown [financial] impact." We see no inherent inconsistency. None of the timely submissions the Auditor received from State agencies sought

to actually "estimate", or offer an approximation,[3] of the costs of the petitions on the agencies' activities. While no agency actually offered a cost estimate, the Department of Health and Senior Services stated that the financial impact of the petitions on its regulatory activities was "unknown." To say that no State agency was able to provide a cost estimate, but that the financial consequences were unknown, is a perfectly coherent – and accurate – summary of the responses the Auditor received. While these circumstances could arguably have been described more precisely, "'[a] fiscal note summary is not judged on whether it is the "best" language, only [on] whether it is fair.'" *Brown*, 370 S.W.3d at 654 (citation omitted).

Point I is denied.

## II.

### A.

Kelly's second Point challenges the second sentence of the fiscal note summary, which states that "[l]ocal governmental entities estimate costs of at least $51,000 annually in reduced tax revenues."

The Auditor solicited fiscal impact submissions from twelve counties, fourteen cities, and five school districts. The Auditor received responses from three counties and two cities. Neither Kansas City nor Jefferson City estimated any direct fiscal impact, although Jefferson City noted the potential for "an indirect fiscal impact resulting from increased lawsuits related to violations of the act [*sic*]." St. Louis County and Clay County likewise estimated no fiscal impact.

---

[3]     *See* https://www.merriam-webster.com/dictionary/estimate.

23

The Auditor derived the reference to $51,000 as the minimum annual cost to local governments from Greene County's fiscal submission. Greene County developed its estimate using its total annual sales tax revenue in 2020 (reduced by revenue-diversion to parks, bond service, and tax increment financing districts), as well as its total real-estate and personal-property tax revenues in the same year. This produced a total tax revenue figure of $112,673,249.02. The County divided this revenue figure by the total number of Greene County residents in 2020 (298,915), to produce a per-capita tax revenue of $376.94. The Department of Health and Senior Services reported that, in 2020, Greene County residents received a total of 135 abortions. Greene County developed its cost estimate by multiplying its per-capita tax revenue figure of $376.94, by the 135 abortions performed in 2020 on Greene County residents, producing an "Annual Cost" to the County of $50,886.90, which the Auditor "rounded up" to $51,000. Thus, Greene County calculated the sales and property tax revenues it received in 2020 on a per-resident basis, and then multiplied that per-resident revenue figure by the number of abortions performed on Greene County residents during the year.

As Dr. Fitz-James points out in her Brief, Greene County's analysis may be simplistic, and may suffer from several material limitations: it fails to consider how many Greene County residents would obtain abortions elsewhere, even if they were banned in Missouri; it fails to consider how many of the abortions performed in 2020 were of otherwise non-viable fetuses; it fails to consider that the existence of additional, newborn County residents may not result in additional property taxes through additional housing, but may simply make

24

existing households larger; and it fails to consider that, if 135 additional children had been born to Greene County residents in 2020, those children might cause additional *expense* to the County by requiring locally funded services (such as schooling or health care). To this we might add that the Greene County estimate assumes that newborn infants generate an equal amount of property and sales tax revenue as the average County resident, which may itself be a dubious proposition. Nevertheless, the Auditor deemed the Greene County estimate to be reasonable, and chose to include it both in the fiscal note, and in the fiscal note summary. Kelly does not argue that the Auditor abused his "great discretion" in crediting the Greene County submission as reliable.

Instead, Kelly first complains that the second sentence of the fiscal note summary is misleading because it characterizes the Greene County estimate as "the possible cost of the Initiative Petitions to all local governmental entities." Kelly's argument ignores, however, that the fiscal note summary explicitly states that local governments estimates costs of "at least" $51,000 – meaning that the Greene County figure was a minimum, or lower bound, of the cost local governments would experience. Contrary to Kelly's arguments, the Auditor did not portray the Greene County figure as a definitive estimate of the total cost localities would experience.

In a similar vein, Kelly argues that the fiscal note summary is misleading because it refers to estimates by "[l]ocal governmental entities," when only Greene County submitted any monetary estimate of expected costs. We addressed the identical complaint in *Protect Consumers' Access*, 488 S.W.3d 665. In that case, *only one* public university responded to the Auditor's request for a

cost estimate – but the fiscal note summary stated that "[s]tate universit*ies* and governmental entit*ies*" estimated certain costs. We rejected challengers' claims that use of the plural was misleading, because it suggested that multiple respondents had estimated costs.

> We agree with the Auditor that the use of the collective term "state universities and governmental entities" is not unfair or insufficient, even if only one entity did in fact respond. For the purposes of a summary, limited by statute to fifty words, it is reasonable for the Auditor's office to state that this single estimated cost was the only estimate provided by the state's universities. It would be unnecessarily cumbersome to require the Auditor's office to more specifically categorize each response received in a summary. The Auditor is tasked with soliciting information from state and local governmental entities to determine what probable affect the initiative would have on state and local finances. Framing the response as one collectively from the state universities and governmental entities as a whole is not misleading or unfair.

488 S.W.3d at 674. Unlike in *Protect Consumers' Access*, where only *one* university system responded to the Auditor's solicitation, in this case *five* cities and counties submitted fiscal impact statements; taken together, those five submissions estimated annual costs of approximately $51,000. If use of the plural was deemed to be fair in *Protect Consumers' Access*, the same result is more strongly justified here.

Kelly also argues that, having credited the Greene County estimate, the Auditor abused his "great discretion" by failing to extrapolate that estimate to the entire State. Kelly argues that this would have been a "simple" exercise, and would more fairly inform voters of the potential State-wide fiscal impact of the initiatives. There are several problems with Kelly's argument.

26

First, although Greene County estimated an annual fiscal impact of $51,000, four other local jurisdictions estimated _no_ fiscal impact from the petitions.  Extrapolating the Greene County estimate to the entire State would have discounted the responses the Auditor received from other localities.

Second, Kelly's argument ignores the Missouri Supreme Court's admonition in _Brown_ that the Auditor is not required to "independently research[ ] the issue himself."  370 S.W.3d at 650.  No commenter submitted a State-wide estimate of foregone local tax revenues employing Greene County's methodology; under _Brown_, the Auditor was not obligated to generate one himself.  "[I]t is not the Auditor's responsibility to undertake an independent investigation and comment upon a possible impact to state finances if no submissions are made to the Auditor describing those impacts." _Protect Consumers' Access_, 488 S.W.3d at 676; _see also Brown_, 370 S.W.3d at 667 ("While it might have been more informative to have had additional information related to the likely fiscal impact of the initiative on '510 lenders,' nothing required the auditor to look beyond the information he was provided in assessing the fiscal impact on those lenders.").

Moreover, despite Kelly's glib contention that extrapolating the Greene County estimate would be a "simple" exercise, she ignores that sales and property tax rates are not uniform State-wide – nor are the value of real and personal property, or the wealth, income and consumption patterns of individuals and businesses.  Further, as Greene County's own calculation reflects, the tax revenues a locality actually receives may be impacted not only by tax rates, and by the value of taxable sales and property, but also by tax abatements or exemptions,

and by the mandatory allocation of particular tax revenues to particular purposes (such as debt service or particular governmental functions). The Auditor would also need to locate a reliable estimate of total abortions on State residents. Whatever the merits of Greene County's fiscal analysis, under existing caselaw the Auditor was not required to independently generate a State-wide estimate of potential lost local tax revenues using that methodology.

Kelly also contends that the Auditor's fiscal note summary ignores that Greene County "made clear that the estimated first-year impact would not just recur but would compound annually with each yearly additional loss of citizens." We disagree. Greene County's submission reports an annual estimated loss of revenue of approximately $51,000. Its submission then states that "an increase in abortion statistics could reasonably be extrapolated to illustrate less tax collections and revenues over the years of potential working lifetimes." It is unclear what Greene County meant by "an increase in abortion statistics"; but it is not at all clear that it referred to the "generational compounding" which Kelly identifies. Further, Greene County did not quantify any compounding effect, if it believed one existed. In any event, the Auditor's reference to an estimated cost of "at least $51,000" allows for the possibility that the cost may increase in succeeding years.

Point II is denied.

### B.

In her brief as Respondent, Dr. Fitz-James argues that Greene County's cost estimate was so flawed and unreliable that the Auditor should have disregarded it, and not referenced it in the fiscal note summary. Dr. Fitz-James

28

asks us to order the reference to Greene County's estimate to be removed from the fiscal note summary, and that the second sentence of the fiscal note summary be modified to state only that "[l]ocal governmental entities estimate no costs or savings."

Dr. Fitz-James' request for modification of the fiscal note summary was not preserved for review. Dr. Fitz-James' answer prayed that the court deny Kelly's request for relief. In the alternative, she prayed that the court "remand the fiscal note summary to the auditor for revision with instructions to state that local and state governmental entities estimate no cost or savings and to exclude any reference to the unfounded claims of partisans opposed to the initiative . . . ." Although this issue was raised in Dr. Fitz-James' answer, Dr. Fitz-James did not herself file a petition, or assert a cross-claim, against Secretary Ashcroft or Auditor Fitzpatrick challenging the fiscal note summary. Under § 116.190.1, an action challenging a fiscal note "must be brought within ten days after the official ballot title is certified by the secretary of state." Dr. Fitz-James failed to assert an independent challenge to the fairness or sufficiency of the fiscal note or fiscal note summary within that time.

Moreover, because the circuit court's judgment upheld the fiscal note summary without revision, Dr. Fitz-James would have had to file a cross-appeal in order to "seek modification of the judgment to achieve more or different relief." *Roberts v. Roberts*, 432 S.W.3d 789, 796 (Mo. App. W.D. 2014) (citing *Johnson v. Medtronic, Inc.*, 365 S.W.3d 226, 239 n.12 (Mo. App. W.D. 2012)). She did not do so.

Because Dr. Fitz-James did not assert an affirmative claim for relief in the circuit court, and did not cross-appeal from the circuit court's judgment upholding the fiscal note summary, she cannot argue for modification of the fiscal note summary now.

**III.**

Kelly's third and final Point challenges the fiscal note summary's third sentence, which states that "[o]pponents estimate a potentially significant loss to state revenue."

Kelly refers to the comments submitted to the Auditor by opponents of the initiatives, which predicted a variety of adverse economic consequences which (they claimed) would flow from liberalized access to abortion: reductions in the labor force; stunting of innovation; diminished solvency of social insurance programs; diminution of income, sales and property taxes; reductions in federal Medicaid funding; increased healthcare costs arising from complications from abortion procedures, and from mental-health conditions caused by abortion-related trauma; an exodus from the State of healthcare professionals who have conscientious objections to abortion; and a boycott of the State by organizations and individuals opposed to the liberalization of abortion access. By referring to the opponents' estimate of "a potentially significant loss to state revenue," the fiscal note summary _does_ refer, albeit generally, to the sorts of adverse economic consequences which Kelly's briefing highlights. It would have been impossible for the Auditor to refer to these heterogeneous potential adverse consequences in any detail in the space of a fifty-word fiscal note summary. As the Supreme Court explained in _Brown_, "[c]ourts must remain mindful that the word limitations of

30

the fiscal note summary necessarily result in exclusion of specific fiscal impact details that might improve the summary but that are not required for it to be upheld as sufficient and fair." *Brown*, 370 S.W.3d at 667.

Kelly's claim that the Auditor was *required* to refer to losses in a particular amount, or of a particular magnitude, is likewise contrary to *Brown*, which explained that

> [t]he fiscal note is required to be sufficient and fair, and it can be considered meaningful, sufficient, and fair even if it does not use the "best" language, set out all details of the proposed measure, or **inform voters of an express amount of potential costs of the initiative**.

*Brown*, 370 S.W.3d at 662 (emphasis added; citation omitted); *see also Sinquefield*, 435 S.W.3d at 683, 685. The comments on which Kelly relies in many cases made no attempt to quantify the adverse economic consequences the commenters predicted; in other cases, commenters offered only rough, order-of-magnitude forecasts. In these circumstances, reference to "a potentially significant loss to state revenue" was fair and sufficient.

Kelly also specifically challenges the use of three words in the summary's final sentence: "opponents," "estimate" and "potentially".

The Auditor's use of the word "opponents" was fair. Kelly herself characterizes the commenters as "lifelong, full-time pro-life advocates and thinkers" – namely, individuals who oppose recognition of a constitutional "right to reproductive freedom." Further, Kelly does not dispute that the commenters *opposed* Dr. Fitz-James' initiative petitions – she merely contends that their economic forecasts were not *colored* by their opposition to the measures.

31

As the Auditor's Brief aptly notes:  "These submissions were in fact received from individuals who oppose the initiatives, otherwise known as: opponents.  As the saying goes, it is what it is."  It is also significant that the Missouri statute which gave these individuals the right to offer fiscal impact statements itself refers to such commenters as "opponents."  *See* § 116.175.1 ("Proponents or opponents of any proposed measure may submit to the state auditor a proposed statement of fiscal impact estimating the cost of the proposal . . . .").  The Supreme Court likewise referred to *these very commenters* as "opponents" of Dr. Fitz-James' proposals.  *State ex rel. Fitz-James*, 670 S.W.3d at 5 ("Opponents of the initiatives indicated they believed the initiatives could risk the state's federal Medicaid funding and result in reduced tax revenues.").  It was not unfair for the Auditor to refer to persons opposing the initiative petitions as "opponents."

The fiscal notes' reference to "estimate[s]" of "potential[ ]" costs was also not unfair.  Despite Kelly's steadfast claims that the costs these commenters identified are "absolutely certain" to occur if any of the initiatives is adopted, the economic consequences of liberalized access to abortion is subject to spirited debate.  Thus, while the argument in Point III of Kelly's Brief begins by citing to an analysis prepared by the Joint Economic Committee *Republicans*,[4] which forecasts considerable economic costs of providing relatively unrestricted abortion access, the Joint Economic Committee *Democrats* published a report

---

[4]  Joint Economic Committee Republicans, *The Economic Cost of Abortion* (June 15, 2022), available at https://www.jec.senate.gov/public/_cache/files/b8807501-210c-4554-9d72-31de4e939578/the-economic-cost-of-abortion.pdf.

claiming that abortion *restrictions* had multi-billion-dollar annual costs.[5] Similarly, while there is undoubtedly academic research suggesting that liberalized abortion access has significant negative economic consequences for the mother, her family, and the broader community, substantial research draws the opposite conclusion.[6] In these circumstances, the Auditor's references to "estimate[s]" of "potential[ ]" costs was not unfair.

### Conclusion

The Auditor's fiscal note and fiscal note summary for the proposed initiative petitions submitted by Dr. Fitz-James are fair and sufficient. The judgment of the circuit court is affirmed.

_____
Alok Ahuja, Judge

All concur.

---

[5] Joint Economic Committee Democrats, *Abortion Access Is Key to Economic Freedom* (Jan. 14, 2022), available at https://www.jec.senate.gov/public/_cache/files/626a7653-81c7-4dc2-ab4c-fefc0137d024/abortion-access-is-key-to-economic-freedom.pdf.

[6] *See, e.g.*, Sarah Miller, Laura R. Wherry, and Diana Greene Foster, *The Economic Consequences of Being Denied an Abortion*, 15 AM. ECON. J. 394 (Feb. 2023); David E. Kalist, *Abortion and Female Labor Force Participation: Evidence Prior to Roe v. Wade*, 25 J. OF LAB. RESEARCH 503 (2004).